394 So.2d 165 (1981)
James H. BOWLING, Appellant,
v.
DEPARTMENT OF INSURANCE, Appellee.
No. PP-379.
District Court of Appeal of Florida, First District.
February 13, 1981.
*166 Tyrie A. Boyer, of Boyer, Tanzler, Blackburn & Boyer, and John London Arnold, Jacksonville, for appellant.
Patrick F. Maroney, Tallahassee, for appellee.
ROBERT P. SMITH, Jr., Judge.
Bowling's appeal concerns the substantiality of evidence supporting an order of the Department of Insurance revoking Bowling's licenses and his eligibility to be licensed as an insurance agent. A hearing officer of DOAH recommended findings, and the Department's final order found, that Bowling committed several similar violations of the insurance code, notably Section 626.611(10), Florida Statutes (1979), which requires license suspension or revocation if the agent is found guilty of
Misappropriation, conversion, or unlawful withholding of moneys belonging to insurers or insureds or beneficiaries or to others and received in conduct of business under the license.
The central allegation in each count of the administrative complaint, and the corresponding finding in the revocation order, is that Bowling through his insurance agency collected automobile liability insurance premiums from insureds, for policies to be issued *167 by United States Fidelity and Guaranty Company, yet forwarded only a premium deposit to USF&G with the application, thereby misappropriating, converting, and unlawfully withholding the premium balance then payable. We find that the record as a whole lacks substantial competent evidence that the agent was required in the regular course of business to forward to USF&G the entire premium received, rather than a deposit only, at the time of forwarding the application for insurance. We therefore vacate the Department's revocation order, dismiss certain charges, and remand the case to the Department for further action on the charges not dismissed.
The charges against Bowling are based on Section 626.611, which in contrast to Section 626.621 (authorizing "discretionary" action against licensees) specifies "grounds for compulsory refusal, suspension, revocation of license or permit." The revocation grounds stated in the Department's order include Bowling's "demonstrated lack of fitness or trustworthiness to engage in the business of insurance,"[1] his willful failure to comply with[2] or circumvention of[3] Chapter 626 requirements for insurance agents, his "fraudulent or dishonest practices,"[4] and, as stated above, his "misappropriation, conversion, or unlawful withholding" of money belonging to USF&G or others. All these charges gain at least some specificity from Section 626.561, which imposes responsibility on insurance agents for "reporting and accounting for funds":
(1) All premiums, return premiums or other funds belonging to insurers or others received by an agent... in transactions under his license shall be trust funds so received by the licensee in a fiduciary capacity, and the licensee in the applicable regular course of business shall account for and pay the same to the insurer, insured or other person entitled thereto.
(2) Any agent ... who, not being lawfully entitled thereto, diverts or appropriates such funds... to his own use, shall upon conviction be guilty of larceny by embezzlement and shall be punished as provided by law.
Under these statutes the Department made eight charges based on seven transactions in which Bowling's agency, Atlas Insurance Agency, Inc., sold a USF&G auto insurance policy under the Florida Joint Underwriting Association program to insure a high risk driver. USF&G was assigned by JUA as servicing carrier for insureds produced by Atlas through its several Jacksonville offices. The evidence and findings in support of each count may be summarized as follows:
Count 1, Lashley. On April 4, 1977, Lashley paid Atlas, Bowling's agency, the entire annual premium of $307, of which Atlas sent USF&G only $100 with the application, and retained the balance. USF&G banked the deposit and mailed the policy to the agency on May 12, 1977. Bowling testified from Atlas records that on May 31 Atlas paid the premium balance to USF&G by check 19837, but the check never cleared the bank and USF&G on December 21 gave notice of cancellation for nonpayment of the full premium. Lashley furnished proof that he had paid Atlas the full premium and USF&G reinstated his policy. The hearing officer found the Department *168 failed to disprove that Atlas forwarded the premium balance on May 31, as Bowling said, but
[T]his does not excuse Atlas nor its managing agent, Bowling, from the necessity to forward all moneys received from Lashley on April 4, 1977, when it was received, and in one lump sum.
Found: Bowling received the Lashley premium in trust for USF&G, and should have forwarded "the full premium payments of $307 in April, 1977, as opposed to $100 in April and $207 in May, 1977," or should have returned the balance to Lashley. Bowling thereby willfully failed to comply with or circumvented code requirements, engaged in fraudulent or dishonest practices, and misappropriated, converted or unlawfully withheld money belonging to others.
Count 2, McGowan. Devco, a premium finance company,[5] financed McGowan's $546 premium and paid it to Atlas, Bowling's agency, in response to Bowling's draft on January 16, 1976. Atlas sent $150 to USF&G with the application and kept the balance. Due to computer difficulties and a backlog of business, USF&G did not bank the $150 deposit nor issue the policy until June 2. Meanwhile, McGowan had not repaid Devco, which requested policy cancellation in March. Because USF&G's computer was incapable of cancelling a policy before it was issued, USF&G did not cancel until mid-July 1976, and then returned to Devco the unearned portion of the $150 deposit previously received. Bowling testified from Atlas records that Atlas check 18779 paid the $366 return premium balance to Devco from Atlas's retainage in April 1977 (nine months after the policy was cancelled), but the check did not clear the bank and Devco claimed it never received the return premium. Found: Bowling received the McGowan premium in trust for USF&G and should have forwarded "the full premium payment of $546, as opposed to a payment of $150," or else should have returned the balance to McGowan. (The hearing officer appears to have assumed but did not expressly find that Bowling did mail Devco a check in April 1977.) Bowling thereby willfully failed to comply with or circumvented code requirements, engaged in fraudulent or dishonest practices, and misappropriated, converted or unlawfully withheld money belonging to others.
Count 3, Morgan. Morgan paid Atlas, Bowling's agency, $95 down; Devco financed and in response to Bowling's bank draft paid Atlas the balance of Morgan's $270 premium, of which Atlas sent $100 with the application to USF&G on December 23, 1975, and kept the balance. Due to computer difficulties and a business backlog, USF&G didn't bank the down payment and issue the policy until May 20, 1976; meanwhile, Morgan repaid Devco sporadically, and Devco requested policy cancellation January 20, 1976, reinstatement on April 2, and cancellation again on April 26. USF&G cancelled on June 30, 1976, but sent Devco no refund because the earned premium exceeded the $100 deposit received in December 1975. Atlas did not reimburse Devco the balance of the unearned premium from the amounts retained; but in March 1979 (two years and nine months after cancellation), Bowling paid Devco the balance of $170 by check of another Bowling insurance agency, Atlas having been dissolved in December 1978. Found: Bowling received the Morgan/Devco payments in trust for USF&G and should have forwarded the full $270 when received, not merely $100, or should have returned the money to Morgan. Bowling thereby willfully failed to comply with or circumvented code requirements, engaged in fraudulent or dishonest practices, and misappropriated, converted or unlawfully withheld money belonging to others.
*169 Count 4, Owens. The Department charged that Owens paid Atlas, Bowling's agency, $116 on account of a total premium of $330, and Devco financed and paid the balance, of which Atlas remitted $100 to USF&G and kept the balance in violation of the same insurance code requirements. USF&G and the Department belatedly found that Atlas was not delinquent on USF&G's books, which contained an erroneous double charge, so the Department voluntarily dismissed this charge before the hearing.
Count 5, Rader. Rader paid Atlas, Bowling's agency, $137 down on a total premium of $370; Devco financed and on Bowling's draft paid the balance to Atlas, which forwarded $100 with the application to USF&G on January 14, 1976, and retained the balance. Due to the same logistical difficulties, USF&G did not bank the $100 deposit until June 21. At Devco's request USF&G cancelled in July 1976 due to Rader's nonpayment to Devco, but USF&G sent Devco no return premium because the earned premium exceeded the $100 deposit received. In April 1978 (one year and eight months later) Atlas reimbursed Devco the adjusted unearned premium of $270. Found: Bowling received a $370 premium payment in trust for USF&G and should have forwarded the entire payment when received, not just $100, or should have returned the balance to Rader. Bowling thereby willfully failed to comply with or circumvented requirements of Chapter 626, engaged in fraudulent or dishonest practices, and misappropriated, converted or unlawfully withheld money belonging to others.
Count 6, Weidman. Weidman paid Atlas $64 on account of a total premium of $184; Devco on December 9, 1975, financed and on Bowling's draft paid the balance to Atlas, which forwarded $50 with the application to USF&G and retained the balance. Due to the same difficulties, USF&G did not bank the deposit and issue the policy until March 30, 1976; meanwhile Devco requested policy cancellation in February, and USF&G later refunded Devco $9 as the unearned portion of the $50 deposit received. On April 25, 1978 (two years after the approximate date of cancellation), Atlas reimbursed Devco $134. Found: Bowling received a $184 premium payment in trust for USF&G and should have forwarded it all when received, not just $50, or should have returned the balance to Weidman. Bowling thereby willfully failed to comply with or circumvented code requirements, engaged in fraudulent or dishonest practices, and misappropriated, converted or unlawfully withheld money belonging to others.
Count 7, Detmer. In May 1977 Detmer paid Atlas $210 down on a total premium of $638 and financed the balance with Premium Budget Service, ante fn. 5. It was assumed but not shown that Premium, an affiliate of Atlas, paid the financed premium to Atlas. On May 13 Atlas forwarded $200 with the application to USF&G, "compared to the full amount of premium required, which would have been the $210 Detmer paid together with that portion of the $428.08 balance related to the premium," according to the hearing officer's findings. USF&G banked the deposit and issued the policy on June 30. Though Detmer in time repaid Premium Budget Service in full, USF&G cancelled the policy in December 1977 for nonpayment of premium beyond the $200 deposit. Bowling testified from Atlas records that Atlas paid the premium balance to USF&G on July 13, 1977, but the check did not clear the bank and USF&G records do not show payment. Found: the Department did not prove Bowling failed to remit the premium balance to USF&G in July 1977, but Bowling, acting for Atlas as well as for Premium Budget Service, "acted inappropriately" in not "forwarding the full amount of premium as one lump sum payment" and in not "following up the cancellation of the policy." Bowling thereby willfully failed to comply with or circumvented code requirements, engaged in fraudulent or dishonest practices, and misappropriated, converted or unlawfully withheld money belonging to others.
*170 Count 8, Cumulative. The Department charged and found: in cumulative effect the specific transactions relied on demonstrate that Bowling lacks the necessary "fitness or trustworthiness" to engage in business as an insurance agent. Section 626.611(7).
The eight charges against Bowling may thus be summarized as:
one count relying on the cumulative effect of seven particular transactions to show that Bowling is unfit and untrustworthy as a licensed agent (Count 8);
one count which the Department dismissed when USF&G conceded that the discrepancy was due to USF&G's error rather than to Bowling's defalcation (Count 4, Owens);
two counts concerning which the hearing officer found that Atlas forwarded part of the received premium to USF&G with the insured's application and the balance within two weeks after the policy was issued by USF&G, but that Bowling fraudulently and dishonestly misappropriated, converted and unlawfully withheld trust funds from USF&G by retaining part of the received premium until the policy was issued (Counts 1 and 7, Lashley and Detmer); and
four counts on which the hearing officer also found that Atlas was required to pay USF&G the full premium received, when received, and that Bowling fraudulently and dishonestly misappropriated, converted and unlawfully withheld from USF&G premiums received in trust. In respect to these transactions, however, it was also found that after USF&G cancelled the policies at Devco's request, Bowling withheld from Devco those same funds, payable as return premiums, for nine months (Count 2, McGowan), two years and nine months (Count 3, Morgan), one year and eight months (Count 5, Rader), and two years (Count 6, Weidman) after the policies were cancelled.
The standards by which these findings are to be assessed are found in the interplay of two statutes quoted above: Section 626.561, characterizing as "trust funds ... received ... in a fiduciary capacity" all premiums, return premiums, and other funds belonging to another and received by an agent, and requiring that the agent account for and pay those funds over "in the applicable regular course of business"; and Section 626.611(10), which requires suspension or revocation of an agent's license for "misappropriation, conversion, or unlawful withholding of moneys" belonging to another. These statutes have been construed by the Department to mean, and they evidently mean, that an agent's license must be suspended or revoked[6] if an agent willfully withholds payment of premium moneys belonging to the insurer or another when in the "applicable regular course of business" the money should have been paid.
Willfullness is a necessary element of a Section 626.611(10) violation because the violation draws essential elements from Section 626.561, a criminal statute which punishes the proscribed conduct as "larceny by embezzlement";[7] because willfullness is explicitly an element of companion subsections including Section 626.611(13), making "willful violation of any provision of this code" a ground for compulsory revocation or suspension; and because, absent the element of willfullness, "unlawful withholding" *171 as employed in Section 626.611(10) would evoke a compulsory and more drastic penalty than companion Section 626.621 imposes for an agent's apparently more flagrant conduct of withholding premiums after demand for payment by the insurer. Section 626.621(4).[8]
The two indispensable elements of the charges against Bowling, then, are that Atlas was obliged "in the applicable regular course of business" to forward to USF&G the entire premium received or to return the retained portion to the insured, and that Bowling willfully caused Atlas to withhold payment and he thereby willfully converted those moneys, temporarily or permanently, to his own use. These elements must be shown by a record foundation of substantial competent evidence. Section 120.68(10).
In a proceeding under a penal statute for suspension or revocation of a valuable business or professional license, the term "substantial competent evidence" takes on vigorous implications that are not so clearly present on other occasions for agency action under Chapter 120. Although all questions of fact as distinguished from policy[9] are determinable under the Administrative Procedure Act by substantial competent evidence, Section 120.68(10), we differentiate between evidence which "substantially" supports conventional forms of regulatory action and evidence which is required to support "substantially" a retrospective characterization of conduct requiring suspension or revocation of the actor's license. Evidence which is "substantial" for one purpose may be less so on another, graver occasion.[10] One takes a stranger's name at his word upon a chance meeting, but wants better proof to cash his check.
Although the APA does not in terms descend to such particulars, we have recognized the Act's implication that evidence "appropriate in form" may differ from one proceeding to another depending on the "nature of the issues involved." Balino v. Dept. of Health & Rehab. Serv., 362 So.2d 21, 24 (Fla. 1st DCA 1978), cert. den., 370 So.2d 458 (Fla. 1979). Now we recognize also that in both form and persuasiveness evidence may "substantially" support some types of agency action, yet be wanting as a record foundation for critical findings in license revocation. Cf. Anheuser-Busch, Inc. v. Dept. of Business Reg., etc., 393 So.2d 1177 (Fla. 1st DCA 1981) (monetary fine). So holding, we need not attempt to resurrect the pre-APA "clear and convincing proof" standard for license revocation proceedings, see Reid v. Florida Real Estate Comm'n., 188 So.2d 846, 851 (Fla. 2d *172 DCA 1966).[11] Rather, we glean a requirement for more substantial evidence from the very nature of licensee discipline proceedings: when the standards of conduct to be enforced are not explicitly fixed by statute or by rule, but depend on such debatable expressions as "in the applicable regular course of business"; when the conduct to be assessed is past, beyond the actor's power to conform it to agency standards announced prospectively; and when the proceeding may result in the loss of a valuable business or professional license, the critical matters in issue must be shown by evidence which is indubitably as "substantial" as the consequences. As we said in McDonald, quoting Mr. Justice Frankfurter in Universal Camera,[12]
The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.
In anyone's judgment, a judge's no less than any other, certain factors present "in the record" of penal proceedings fairly detract from the substantiality of evidence which is weighty enough for less consequential purposes. One such factor is a grave penalty. In determining "the substantiality of evidence," which is to say in ascertaining what we call the facts, a judge takes the penalty into account for the same reason that compels him, in ascertaining the law, to impose a "strict" construction on the penal statute. Bach v. Board of Dentistry, 378 So.2d 34, 36 (Fla. 1st DCA 1979):
Where statutes provide grounds for revocations of licenses, those provisions must be strictly construed and strictly followed because the statute is penal in nature. State v. Pattishall, 99 Fla. 296, 126 So. 147, 148 (1930).
Thus in Bach the court reversed a dentist's suspension for the statutory offense of "permitting" improper conduct by a hygienist when it was not shown that the dentist had "full knowledge" of that conduct. So holding, the court drew on pre-APA decisions requiring proof that the licensee's employees "repeatedly and flagrantly" violated the law, and vacating revocations based on proof "that on one occasion the licensee's employees violated the laws, but ... the licensee otherwise took measures to comply with them." Bach, 378 So.2d at 36. See also Poirier v. Division of Health, Dept. of Health & Rehab. Serv., 351 So.2d 50 (Fla. 1st DCA 1977), requiring proof that the licensee had "guilty knowledge" that he had sold a rebuilt hearing aid as new. Bach and Poirier illustrate that the violation of a penal statute is not to be found on loose interpretations and problematic evidence, but the violation must in all its implications be shown by evidence which weighs as "substantially" on a scale suitable for evidence as the penalty does on the scale of penalties. In other words, in a world ensnarled by false assumptions and hasty judgments, let the prosecutor's proof be as serious-minded as the intended penalty is serious.
No statute or Department rule prescribes "the applicable regular course of business" for an insurance agent in the matter of handling premiums. That being so, the Department relied on evidence to show that under "the applicable regular course of business," Section 626.561(1), Bowling should have forwarded a check for the entire premium received, when received, to USF&G. The Department's evidence to that effect was not substantial. The Department did not prove that some authority having power to prescribe for agents "the applicable regular course of business" in handling premium payments  the Department, or the Joint Underwriting Association, or USG&G?  had done so; nor did the evidence show, if some authority had prescribed a standard, that knowledge of it was brought home appropriately to *173 agents generally and Bowling particularly. The JUA Operating Agreement is in evidence, but it is silent on the subject. No writing in the record speaks to the issue. To carry this point the Department relied on witnesses who could but state their "understandings," from various and dubious vantage points, of what was required of agent Bowling.
Thus the assistant superintendent of USF&G's Jacksonville accounting department, a keeper of financial records, was drawn beyond his field of competence to testify that, according to guidelines established by some unidentified source, "it is my understanding [the agent] submits whatever he collects, with a minimum of whatever the minimum deposit would be... ." To a question by the Department's lawyer, summarizing the Department's view of the agent's responsibility, the witness replied, "I believe that's correct." Another witness, a USF&G underwriter who displayed no more authority to speak on the subject than the accountant did, testified that he had once read some JUA operating rules saying "if you got it send it in," but he said the purported rule was not generally adhered to by the USF&G agents, and he didn't really know whether this ever was a "rule." He also identified USF&G correspondence to agents, dated long after the events here in question, which sought to clarify apparent misunderstandings concerning USF&G policy on the subject. Finally, Mr. Varnes, the former president of Devco, testified that as a JUA agent for Allstate, he sent the insurer all money he received the same day it was received, and "That's how everybody does it."
This kind of testimony affords no substantial basis for erecting a standard on which to judge whether an agent not adhering to it is guilty of fraud equivalent to embezzlement of trust funds. To his credit, the hearing officer expressed similar doubts to the Department's lawyer in the course of argument on an objection:
DEPARTMENT'S COUNSEL: [T]here are certain rules, and the testimony has been, you have to send the money. The company has said that; Mr. Varnes has said that.
HEARING OFFICER: That is their perception of it. If their perception comports with the requirement of law, it is not because of their perception that I would be finding in your favor on that point; it would be because of the requirements of law.
The Department sought unsuccessfully to exclude Bowling's testimony of his own "understandings" and general practices:
BOWLING: During the time we were doing business with USF&G as Atlas Insurance Agency, we were doing business under another agency with a different carrier and doing it the same identical way that we were doing it with USF&G.
Bowling testified that his agency's practice, and a proper practice, was to send a deposit with the application and the balance when the policy was issued.
The absence of substantial competent evidence undermines the hearing officer's finding (apparently receding from his remarks to the Department's counsel during the hearing) that JUA or USF&G or some other authority placed Bowling under a duty to forward to USF&G the entire premium received, when received. Specifically, substantial competent evidence did not negate the hypothesis, consistent with what Bowling claimed was the regular and proper course of business, and in important respects consistent too with USF&G's dealings with its agents, that the agent need send only a deposit with the insured's application, and should send the premium balance when the policy is issued. In point of fact, because of USF&G's self-confessed "atrocious" service due to computer incapacities,[13] USF&G did not even bank Atlas premium deposit checks for up to six *174 months after they were received with applications, and the money represented by those checks remained for those periods undisturbed in the Atlas bank account with the premium balance which, it is claimed, Bowling had misappropriated by not forwarding.[14]
We specifically reject the Department's contention that the "applicable regular course of business" for an agent's handling of JUA premiums was established, for purposes of this proceeding, by the Department's order in In the Matter of Kathryn Genevieve Saviak, Case No. 78-L-101P, DOAH Case No. 79-332, 1980 Fla. Admin.Law Rep. 891-A. The recommended and final orders in that licensee discipline proceeding unquestionably held that JUA agents of USF&G "were required to forward to the servicing carrier money they received in payment of premiums on the date received or, at the latest, on the following day,"[15] but the Department's finding in Saviak had no probative or precedential value whatever in this case. If the matter in issue were one of Department policy, a Department rule would be wellnigh conclusive, and a policymaking order based on an adequate record foundation in this case[16] would command great deference. But plainly the matter in issue is not Department policy, and the Department has not treated it as such; rather the issue is over a plain, garden-variety fact: Was the agent required by some agreement, or some manual, or some common understanding to remit all premium money daily when received? That is an adjudicative rather than a legislative fact, as Davis differentiates them;[17] that is the kind of fact we have described as devoid of "policy considerations for which the agency has special responsibility," and therefore as determinable by the trier of conventional facts. McDonald, supra fn. 9, 346 So.2d at 579. The Department cannot rely on its proof in Saviak to cure an evidence deficiency in this case.
Nor is the evidence deficiency remedied by the hearing officer's finding *175 that Bowling was "not believable" in testifying that, to assure prompt return to Devco of unearned premiums when a USF&G policy was cancelled before it was computer-issued, he and Devco's principal, Varnes, agreed that Atlas would withhold a portion of the financed premium until it was clear that the policy would be issued and not immediately cancelled.[18] We of course defer to the hearing officer on a question of the believability of witnesses. Were there substantial evidence showing the asserted fact which Bowling's testimony contradicted, the rejection of Bowling's testimony as "not believable" would leave the substantial evidence uncontradicted. But, as we have held, that substantial evidence is missing. A witness who is found to be untruthful gives the trier of facts an additional reason to believe substantial evidence to the contrary, but in our heritage the accused's unbelievable denial of an essential element in the accusation does not prove the accusation.
The absence of substantial competent evidence proving Bowling's asserted duty to remit to USF&G all premium money received, when received, requires that the Department's charges on Counts 1 and 7 be dismissed, for in the Lashley and Detmer transactions Atlas remitted the retained premium balance within two weeks after the policy was issued and no permissible view of this record permits condemnation of that action. The guilty finding on Count 8, charging that the seven transactions cumulatively show Bowling's unfitness and untrustworthiness, must be set aside and remanded, that count having now been deprived of cumulative support from two more transactions, in addition to the voluntarily dismissed Count 4, on which it depends. Finally, the guilty findings on the four remaining substantive counts (Counts 2, 3, 5 and 6, McGowan, Morgan, Rader, and Weidman) must be set aside because Bowling's guilt in those transactions is expressly predicated, though perhaps not necessarily so, on the unproven premise that Atlas was required to remit to USF&G all premium moneys received, when received.
The relevant statutes and the original administrative charging document[19] are broad enough to have permitted the Department to proceed against Bowling upon a different theory than that reflected in the recommended and final orders. The Department might have accepted Bowling's concept of what the applicable regular course of business was in handling JUA premiums financed by Devco  to send an acceptable deposit with the application, and the balance when the policy is issued  and might have charged Bowling with having willfully misappropriated, converted, or withheld from Devco the balance which was payable as a return premium when the policy was cancelled before being issued. There is at least a possibility that the evidence adduced in support of Counts 2, 3, 5 and 6, so construed, could lawfully be regarded as substantial. We intimate no view of that at this time, for such findings are the initial responsibility of the trier of facts and the agency.
The Department may of course feel constrained by its exclusive adherence to the more demanding standard of agency conduct which we have found unproven; but if not, the Department is at liberty to conduct further proceedings upon Counts 2, 3, 5, 6 and 8. However, the Department may proceed in respect to these transactions only on *176 the theory to which we have alluded, and will proceed no further on the theory we have pronounced unfounded in the evidence. The existing record may be used. Because the pending substantive counts are now fewer, and the question of Bowling's alleged willfulness is all the more important, the Department may and on Bowling's application it shall provide a further evidentiary hearing. Section 120.68.
The order revoking Bowling's license and his eligibility for licensing is VACATED and the cause is REMANDED.
THOMPSON, J., and WOODIE A. LILES (Ret.), Associate Judge, concur.
NOTES
[1] Section 626.611, Florida Statutes (1979):

The department shall deny, suspend, revoke, or refuse to renew or continue the license of any agent ... and it shall suspend or revoke the eligibility to hold a license or permit of any such persons if it finds any one or more of the following applicable grounds exist:
.....
(7) For demonstrated lack of fitness or trustworthiness to engage in the business of insurance.
[2] Section 626.611(13):

(13) Willful failure to comply with, or willful violation of, any proper order, rule, or regulation of the department or willful violation of any provision of this code.
[3] Section 626.611(4):

(4) If the license or permit is willfully used, or to be used, to circumvent any of the requirements or prohibitions of this code.
[4] Section 626.611(9):

(9) Fraudulent or dishonest practices in the conduct of business under the license or permit.
[5] This account has been simplified for clarity. In this and the other transactions involving Devco Premium Finance Company, the insured's original premium finance agreement was with Premium Budget Service, Inc., an affiliate of Atlas managed by Bowling and owned by his wife. Premium Budget Service routinely sold the finance contracts to Devco. Bowling's draft on Devco for the premium was payable to Premium Budget Service, which then remitted to Atlas, the producing agency.
[6] The hearing officer in this case recommended revocation but expressed the opinion that Section 626.681 ("Administrative fine in lieu of suspension, revocation, or refusal of license") permits the Department to fine Bowling instead of revoking or suspending his license. The Department disagrees, saying in its final order that suspension or revocation is required for conduct proscribed by Section 626.611. The Department is competent so to interpret those statutes. Rice v. Dept. of Health & Rehab. Serv., 386 So.2d 844, 847 (Fla. 1st DCA 1980); ABC Liquors, Inc. v. Dept. of Business Reg., etc., 397 So.2d 696 (Fla. 1st DCA 1981).
[7] Section 812.012(2)(d)1, Florida Statutes (1979), the omnibus theft statute, specifically includes "Conduct previously known as ... embezzlement," and proof of a specific criminal intent is constitutionally necessary for a conviction by due process, though the element is not particularly mentioned in the statute. State v. Allen, 362 So.2d 10 (Fla. 1978).
[8] Section 626.621(4) specifies as a ground "for discretionary refusal, suspension, or revocation of license or permit":

(4) Failure or refusal, upon demand, to pay over to any insurer he represents or has represented any money coming into his hands belonging to the insurer.
The redundancy of Sections 626.611(10) and 626.621(4) is unresolved by any Department rule or order interpreting and explaining the statutes. The apparent duplication is traceable to 1947, when the second of two statutory systems was enacted to regulate life insurance agents. Ch. 20327, Sec. 5, Fla.Laws (1941), Section 634.21, Florida Statutes (1953), corresponding to present section 626.621(4); and Ch. 24086, Sec. 13, Fla.Laws (1947), Section 627.31, Florida Statutes (1951), Section 634.21, Florida Statutes (1953), corresponding to present Section 626.611(10). See also Ch. 25406, Sec. 14, Fla.Laws (1949) (accident and health insurance agents) and Ch. 28075, Sec. 26, Fla.Laws (1953) ("Insurance Agents and Solicitors License Law").
[9] The requirement for an agency's evidentiary verification of nonrule policy choices within statutory limits rests on different principles than the requirement for proof of conventional facts. As to those principles, see ABC Liquors, Inc. v. Dept. of Business Regulation, etc., ___ So.2d ___, No. SS-372 (Fla. 1st DCA op. filed 2/11/81); Rice v. Dept. of Health & Rehab. Serv., 386 So.2d 844, 850 (Fla. 1st DCA 1980), elaborating the "record foundation" required by Florida Cities Water Co. v. Florida Publ. Serv. Comm'n, 384 So.2d 1280 (Fla. 1980) and McDonald v. Dept. of Banking & Finance, 346 So.2d 569 (Fla. 1st DCA 1977).
[10] Professor Davis puts the same thought this way, 4 Administrative Law Treatise, Sec. 29.02, p. 126:

Whatever impression a literal-minded reader may get from the words in the statute book, the plain reality is that the substantial-evidence rule as the courts apply it is a variable.
[11] Reid was disapproved on other grounds in Van Eaton v. State, 205 So.2d 298 (Fla. 1967).
[12] McDonald, supra fn. 9, 346 So.2d at 579, quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456, 467 (1951). In Justice Frankfurter's aphorism Professor Davis finds verification that the substantial-evidence rule "is made of rubber, not of wood." Administrative Law of the Seventies, Sec. 29.00 at pp. 651-53. See also fn. 10 supra.
[13] USF&G's assistant manager in Jacksonville wrote to another agent in June 1976:

This will acknowledge your inquiry in regard to our service of our JUA business which in all respects has certainly been atrocious and is not up to USF&G standards. In order to understand what our problem has been I think it best to give you the history....
[14] Bowling testified that Atlas used this checking account to pay its "light bill" and other expenses, but there was no proof, as contrasted with conjecture, that any part of the retainage was spent.
[15] Saviak, 1980 Fla. Admin.Law Rep. at 894-A, continuing:

An agent need not require payment of the entire premium in order to write an insurance policy, so long as the agent collected a specified minimum deposit. Any money actually collected above the amount of the minimum deposit, however, was to be forwarded to the servicing carrier daily... . Agents were first advised of this [USF&G] requirement in writing on or about September 17, 1973.
[16] See authorities cited fn. 9 supra. This is not to say that Saviak, by proper nonrule policymaking on an adequate record in that case, could conclusively establish agency policy for purposes of this disciplinary proceeding. The necessity of reproving contested nonrule policy in Section 120.57 proceedings is the price the agency pays to avoid rulemaking. Hill v. School Board of Leon County, 351 So.2d 732 (Fla. 1st DCA 1977), cert. den., 359 So.2d 1215 (Fla. 1978); State Dept. of Health and Rehab. Serv. v. Barr, 359 So.2d 503, 505 (Fla. 1st DCA 1978) ("But the rule is stare decisis, not res judicata ... Section 120.57 proceedings will afford him the opportunity to attack the agency's position by appropriate means... ."); contrast Jax Liquors, Inc. v. Division of Alcoholic Bev. and Tobacco, etc., 388 So.2d 1306 (Fla. 1st DCA 1980).
[17] 1 Davis, Administrative Law Treatise, Sec. 7.02 at p. 413:

Adjudicative facts are the facts about the parties and their activities, businesses and properties.... Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion.
Davis poses this dichotomy principally to distinguish between facts which he considers a policymaking agency must conventionally prove ("adjudicative" facts) and those which it need not so verify and may simply announce ("legislative" facts). This court has recently determined to avoid this abstract and unprofitable debate over definitions, preferring to require proof even of "legislative" facts when they are reasonably susceptible to some kind of proof, and when requiring proof contributes vitality and verification to agency decisionmaking. E.g., Rice v. Dept. of Health & Rehab. Serv., supra fn. 9; ABC Liquors, supra fn. 9; Anheuser-Busch, Inc. v. Dept. of Business Reg., 393 So.2d 1177 (Fla. 1st DCA 1980). This approach is supported by Clagett, Informal Action  Adjudication  Rule Making: Some Recent Developments in Federal Administrative Law, 1971 Duke L.J. 51, 78 et seq.
[18] The hearing officer gave two other reasons, besides not believing Bowling for rejecting his testimony concerning an agreement:

Varnes testified and did not acknowledge that agreement; additionally, any such agreement would be contrary to the requirement that the full amount of the premium be submitted by Atlas... .
Varnes, though he testified, was not asked about the asserted agreement; and the contrariness of the asserted agreement to "the requirement" is inconsequential until "the requirement" is shown by substantial competent evidence.
[19] Each count typically alleged:

That you, JAMES H. BOWLING, ... collected and received monies belonging to insureds, insurers or others in transactions under your license which funds you failed to account for or pay to the insurer, insured or other persons.