# DEPARTMENT OF PROFESSIONAL REGULATION, DIVISION OF REAL ESTATE v RICH HILL REALTY, et al.

## Case No. 85-1757

State of Florida, Division of Administrative Hearings

November 7, 1985

### APPEARANCES OF COUNSEL

**Arthur Shell, Jr.,** Department of Professional Regulation, for petitioner.

**Earl Nicholson** for respondents.

### OPINION

ARNOLD H. POLLOCK, Hearing Officer.

### *RECOMMENDED ORDER*

Consistent with the Order granting Respondent's Motion, *ore tenus*, for Continuance dated July 17, 1985, a hearing was held in this case

before Arnold H. Pollock, a Hearing Officer with the Division of Administrative Hearings in Palatka, Florida, on September 23, 1985. The issue for consideration was whether Respondents' licenses as a real estate brokerage company and real estate brokers, respectively, in Florida, should be disciplined because of the alleged misconduct outlined in the Administrative Complaint filed herein.

## BACKGROUND INFORMATION

On May 8, 1985, Fred Roche, Secretary, Department of Professional Regulation, signed an Administrative Complaint in this case alleging in four Counts that Respondent had, in several respects, violated Section 475.25(1), *Florida Statutes*, in the operation of a real estate brokerage business in Palatka, Florida, in September and October, 1984. Thereafter, on May 24, 1985, the Respondents individually submitted election of rights forms in which they disputed the allegations of fact contained in the Administrative Complaint and requested a formal hearing. By undated letter, counsel for the Petitioner forwarded the file to the Director, Division of Administrative Hearings, for the appointment of a Hearing Officer, and on July 3, 1985, the undersigned, having been appointed as Hearing Officer in this case, sent out a Notice of Hearing to the parties indicating the hearing would be held on August 16, 1985. A motion, *ore tenus*, for continuance was submitted by the Petitioner with no objection by Respondents. The August 16 hearing was cancelled and the matter reset for September 23, 1985. At the hearing, Petitioner presented the testimony of both Mr. and Mrs. Bowen, Robert P. Reck, cashier of the Citizen's . First National Bank of Crescent City; Peter M. Christensen, Codes Administrator for Putnam County, Florida; and Ann Keele, specialist in residential lending for Security First Federal Savings & Loan Association in Deltona, Florida. Petitioner also introduced Petitioner's Exhibits 1 through 6. Respondents Richard and Hildred Woodall testified in their own behalf as did their daughter, Debra Jane Godwin. Respondent's introduced Respondents' Exhibits A through N.

Both parties have submitted Proposed Recommended Orders which contain Proposed Findings of Fact. Respondent has failed to number the paragraphs containing the Findings of Fact prior to submission. These Proposed Findings of Fact have been reviewed and considered in the preparation of this Recommended Order and for the purpose of identification in the Appendix hereto, Respondent's Proposed Findings of Fact have been numbered by the undersigned. In the Appendix, each Proposed Finding of Fact has been either accepted or rejected, in whole or in part.

## FINDINGS OF FACT

1. On September 4, 1984, Idus B. Bowen and his wife, Jean, were shopping for a lamp in Respondents' furniture store in Palatka, Florida. Mr. and Mrs. Bowen had recently retired and moved to Palatka where they intended to settle. The clerk they dealt with at the furniture store, who happened to be the Respondents' daughter, in the course of conversation regarding the Bowens' move, indicated that her father had a place for sale on the water. When the Bowens indicated some interest, she got some of the details as to size, location, and price from her father and discussed the matter with the Bowens. As they seemed to show some interest, she introduced them to her father, Respondent Richard Woodall, who discussed it with them and, that same day, took them out to see the property which was, at the time, occupied by his wife and him. When Woodall first talked with the Bowens about the property in his office at the furniture store, he advised the Bowens that he was a real estate broker but that he was selling this property, his personal home, as the owner and not the broker. Several times that day, both on the way to the house and at the house, he advised the Bowens he was selling as an owner and not as a broker.

2. On the first visit to the house, Mr. Woodall showed the Bowens both the inside and the outside. They stayed approximately an hour and a half and the Bowens got a full view of the house and the property on which it was located and Mr. Woodall gave Mr. Bowen a plat of the property. No agreement was reached that day, however.

3. Two days later, on September 6, 1984, Mr. Bowen again went to the furniture store to talk over the terms Mr. Woodall was offering on the sale. At this time he was advised by Mr. Woodall that there was an outstanding loan on the property of approximately $39,400.00 at $8\frac{1}{2}\%$ interest. This figure was determined by Mr. Woodall through a call to the lending institution and he received a tentative approval for the Bowens to assume this loan at a rate of $11\frac{7}{8}\%$. Mr. Woodall passed this information on to the Bowens but in doing so, mistakenly stated the assumption percentage rate as 11.78%. In reality, the figure was $11\frac{7}{8}\%$ which, when converted to a decimal presentation, is reflected as 11.875%. Mr. Bowen did not realize this difference, however, until some time after the contract was signed.

4. On this same date, September 6, 1984, after receiving the financing information from the lending institution, Mr. Woodall suggested that the Bowens again go out to the house so that his wife could show the property from a woman's point of view. When the Bowens agreed,

an appointment was made for the showing by Mrs. Woodall for the next day, September 7, 1984.

5. On the 7th, Mrs. Woodall showed the Bowens the house in detail. After doing so, she suggested that the Bowens stay for coffee and refreshments and when the Bowens agreed, called her husband to come home and join them. Before Mr. Woodall got there, however, Mrs. Woodall asked if the Bowens were ready to sign a contract. The Bowens indicated they were not. When Mr. Woodall arrived, he and Mr. Bowen went out for a walk around the property during which Mr. Bowen asked about the need for a fence around the swimming pool. Mr. Woodall assured him that since the house was located on the water, it was not necessary to fence the pool area all the way around. Mr. Woodall, while admitting Mr. Bowen asked about the water level in the canal, states there was no discussion of flooding and he further contends that Mr. Bowen did not discuss the issue of the fence until after he went to the County office subsequent to signing the contract. No doubt Mr. Woodall answered the questions asked by Bowen to the best of his knowledge and belief. Based on this information they went back to the house where Mr. Bowen agreed to sign a contract for the purchase on Saturday morning, September 8, 1984, in the Respondents' office in the furniture store.

6. On September 8, 1984, both the Bowens and the Woodalls signed a contract for the sale of the Woodalls' property for a purchase price of $125,000.00 with $5,000.00 to be placed in escrow in Respondent, Rich Hill Realty's escrow account. The contract also called for the Bowens to assume a mortgage in the amount of $39,400 at 11.78% and the balance due was to be paid in cash at closing to be held as soon as possible. The contract was conditioned upon the purchaser obtaining a firm assumption commitment within 15 days.

7. At the time of signing the contract, Mr. Bowen gave the Woodalls a check for $5,000.00. When the Bowens arrived, the contract had already been prepared and signed by Mrs. Woodall. Once all remaining parties had signed, Mr. Woodall had it witnessed.

8. The contract called for the deposit of $5,000.00 to be placed in escrow and Mr. Bowen assumed that it would be so placed because the sellers were both real estate professionals. He contends that if he had not thought the deposit would be placed in escrow, he doubts he would have paid a deposit to the Woodalls at that time. In all his previous real estate purchases, the money was placed into escrow and not drawn out until later.

9. On September 10, 1984, after further consideration of the pur-

261

chase and based on the fact that the pool was the same depth from one end to the other, a depth beyond the height of his non-swimming wife, Mr. Bowen went to Mr. Woodall to see if he would release him from the contract. When Mr. Woodall refused, however, he accepted the refusal. He immediately made application to assume the Woodalls' loan with Security 1st Federal Savings & Loan Association, which, on September 18, 1984, furnished him a good faith estimate of settlement charges which reflected the interest rate at 11.875%.

10. Just about this time, Mr. Bowen also became concerned as to whether the property was in the flood zone and called the Putnam County Zoning Board where he was advised that the property in question was in fact in the flood plain. When he also asked if the pool needed to be fence, he was told that where there was a pool, it was required to be fenced all around with a four foot high fence with lockable gates.

11. When Mr. Bowen received this information, he immediately reported it to Mr. Woodall who said he would check with the County and get it straightened out. Mr. Woodall thereafter called Mr. Bowen back and told him that the property was declared to be in the flood plain sometime in 1983 and that the pool regulation became effective sometime after that, but that since the house was built before either regulation came into effect, it was grandfathered in and the rules would not apply.

12. In the meantime, Mr. Bowen's application to assume the Woodalls' loan was approved. No assumption agreements were ever signed by the Bowens because by this time Mr. Bowen had determined that the deal was not good for him and he had decided that he would not go through with it.

13. Mr. Bowen consulted an attorney who discovered some additional minor discrepancies in the transaction such as (1) the legal description of the property was incorrect, and (2) the estimate of closing costs had not been furnished by the seller. Neither of these discrepancies are relevant to the issues for consideration at this hearing, however. On the basis of what he had already discovered and this additional information, Mr. Bowen refused to close on the contract as called for on September 25, 1984, and requested a refund of the $5,000.00 deposit by a letter from his attorney to the attorney for the Woodalls'. Mr. Bowen did not receive an answer to his demand for refund of the deposit and despite several subsequent requests, the money has never been refunded. No action has been filed in court to force return, however. On November 28, 1984, Respondents notified the Bowens their deposit had been forfeited for failure to close.

14. Mr. Bowen admits that Mr. Woodall advised him on their first trip to the property that he was a real estate broker but that he did not deal with the public. He only dealt in real estate for his own investments. Mr. Bowen also admits that he did not read the contract in full before he signed it. He admits that there were no special clauses inserted in the contract at his request nor did he request that any comments be made in the contract regarding the flood plain or the pool. When he signed the contract, however, he claims he was relying on the representations made to him by Mr. Woodall which he checked out only after affixing his signature to the contract.

15. Both Mr. and Mrs. Bowen declined to sign the contract contending they felt the property had been misrepresented by Mr. Woodall in the particulars regarding the alleged misrepresentation dealing with the fence around the pool, the fact that the property is located on the flood plain, and the fact that there is a discrepancy in the interest rate.

16. The $5,000.00 deposit was in fact placed into the Rich Hill Realty escrow account by Mr. Woodall. However, on January 31, 1985, more than three months later, Mrs. Woodall, an officer of Rich Hill Realty, drew the amount out of the escrow account and purchased a certificate of deposit with the Citizen's 1st National Bank of Crescent City with it. This certificate has been rolled over upon maturity since that time.

17. With regard to the state of the County Ordinances concerning fences around swimming pools in this County, according to Peter M. Christensen, the Codes Administrator for Putnam County, pools built before 1975 would not require fencing. The requirement for a four foot fence was enacted by the County Commission in 1976.

18. With regard to the flood plain situation, the area where the property in question is located is classified A-3, which means that the first floor of any dwelling must be at least six feet above mean sea level. Mr. Christensen cannot say for certain whether this particular property is located in the flood plain because he did not have the maps available to him at the hearing. However, the majority of the property in the area where the Woodall property is located is within the flood plain.

19. According to Ms. Ann Keele, a specialist in the residential lending service of the Security 1st Federal Savings & Loan Association, which holds the mortgage on the Woodall property, at the time the Woodalls secured their loan, there was no requirement for flood insurance because there was no flood plain regulation in effect. She recalls the flood insurance program as coming into effect sometime in 1980 and her bank's policy is to require flood insurance if (1) the

263

community is participating in the flood insurance program, or (2) if the area is prone to flooding. When the flood insurance program went into effect, the bank did not notify existing borrowers of the need to take out flood insurance.

20. Since the Woodalls purchased their property and got their mortgage prior to 1980, they well may not have known of the change in the law and the requirement for flood insurance. As a matter of fact, had the Woodalls kept their property, they would not have had to purchase flood insurance. Upon assumption, however, a new purchaser would have to buy it. To determine those properties requiring flood insurance, the bank uses flood maps provided by a governmental agency. Most real estate agencies use the same maps but Ms. Keele cannot be sure whether Respondent had one or not.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties and the subject matter of this proceeding.

In Count I of the Administrative Complaint, Petitioners allege that by virtue of the alleged erroneous statements made by Mr. Woodall to Mr. Bowen regarding the status of the flood plain, the requirement for the swimming pool to be fenced in, and the interest rate, and because of the fact that the Woodalls failed to maintain the $5,000.00 deposit in their real estate escrow account, they are guilty of fraud, misrepresentation, concealment, false promises, false pretenses, dishonest dealing by trick, scheme, or device, culpable negligence and breach of trust in a business transaction in violation of Section 475.25(1)(b), *Florida Statutes.*

Section 475.25 permits the Commission to discipline a licensee's license if it finds that the licensee has committee various offenses as outlined in subsections (a) through (p) of this section. Subsection (b) authorizes discipline if the licensee:

Has been guilty of fraud, misrepresentation, concealment, false promises, false pretenses, dishonest dealing by trick, scheme, or device, culpable negligence, or breach of trust in any business transaction in this or any other state. . . .

The evidence here clearly shows that Respondents did not in fact indicate to the Bowens during the conversations which led up to the signing of the contract for the transfer of this property that the property was located in the flood plain when in fact it was. The evidence is also equally clear, however, that at the time the statements were made, Mr. Woodall did not believe that the property was located

264

in the flood plain as he had, himself, never been advised by his lending institution that flood insurance was necessary and the program requiring flood insurance did not come in effect until after he purchased the property. The banker clearly stated that Mr. Woodall had not bee notified of the change in his property's status and had he continued to own the property, no notice would have been given to him of the requirement to take out flood insurance. Under these circumstances, it is hard to see how Mr. Woodall could be held responsible for failing to transmit information which was not made available to him. It could, perhaps, be said that as a real estate agent he has the duty to keep himself informed on all changes regarding the area in which he does business. In the instant case, however, it cannot reasonable be said that Mr. or Mrs. Woodall were attempting to conceal from the Bowens something that they were familiar with with a view toward making the sale.

As to the issue of the fence around the swimming pool, the evidence here shows that at the time the Woodalls took out the permit to construct it, the law was quite clear that a fence was not required. Had the Woodalls, upon completion of the construction of the pool, learned of the need for a fence and thereafter concealed this need from the Bowens, then a different situation would accrue. However, there is no evidence that the Woodalls were ever made aware of the requirement for the fence and it cannot be said, then, that they were guilty of any concealment when they failed to advise the Bowens of something that they themselves may not have been aware of.

There is one other area on which the Administrative Complaint alleging misrepresentation, etc., is based and that deals with the interest rate placed on the contract by Mr. Woodall which was, in fact, in error. This error can, however, reasonably be explained in that the 11⅞% which was the actual rate is quite similar in sound to 11.78% and absent a more substantial showing of intentional misconduct on the part of the Woodalls, Mr. Woodall's negligence in placing the wrong percentage rate on the contract cannot be said to be so gross as to constitute culpable negligence as called for in the statute. Therefore, it is concluded that none of the actions as outlined here on the part of either Mr. or Mrs. Woodall constitutes that degree of misconduct as it outlined in subsection 475.25(1)(b) to justify discipline of their license.

In Count II of the Administrative Complaint, Petitioners allege that the Respondents are guilty of failure to account for and deliver the $5,000.00 escrow deposit to the persons entitled thereto, the buyers, in violation of Section 475.25(1)(d).

This provision allows discipline of a licensee's license if the licensee:

265

Has failure to account or deliver to any person . . . at the time which has been agreed upon or is required by law or, in the absence of a fixed time, upon the demand of the person entitled to such accounting and delivery, any personal property such as money, funds, deposit, check, . . . which has come into his hands and which is not his property or which he is not in law or equity entitled to retain under the circumstances.

Here, the Bowens, at the time of the signing of the contract, gave the Woodalls a $5,000.00 deposit. Thereafter, for reasons including those described above as the basis for action in Count I, the Bowens decided not to go through with the purchase and requested their money back. Though they retained the services an attorney to represent them in their efforts to secure refund of the money, Mr. Bowen and Mr. Woodall both indicate that no suit has been filed to recover the deposit and the Bowen's efforts have been solely through the services of an attorney making requests for refund and their complaint to the Commission.

It is clear that the forum for the resolution of the rights of the parties regarding the contract and the deposit given thereunder lies in the courts and not at the administrative hearing level. There remains a substantial question of fact and law as to who is entitled to the deposit —the Bowens or the Woodalls. Mr. Woodall had available to him the services of the Real Estate Commission which, in subsection (d), becomes available for the resolution of "doubts or conflicting demands," however, this service of the Commission is generally reserved for brokers who are holding funds regarding property with which they are not personally involved. Here, Mr. Woodall made clear that though he was a broker, he was in this case selling his own property for himself and there is a substantial question as to whether he was obligated to refer this dispute to the Real Estate Commission since he was not acting as a broker in these particulars. Be that as it may, the circumstances here fail to establish that the Respondents here had the obligation to deliver the $5,000.00 escrow deposit to the Bowens.

In Count III of the Administrative Complaint, the Respondents are alleged to have violated Section 475.25(1)(d) by failing to promptly notify the Florida Real Estate Commission of conflicting demands for a deposit. As was stated above, it is not clear that the Respondents here, selling their own property and acting not as brokers but as sellers, were obligated to notify the Commission of their own demand for the disputed deposit. Consequently, it is concluded that under the circumstances of this case, there was no violation of the statute here.

In the last Count of the Administrative Complaint, Respondents are

alleged to be guilty of failure to maintain the buyer's deposit in an escrow account until disbursement had been properly authorized in violation of Section 475.25(1)(k).

This provision permits discipline of a broker who:

Has failed, if a broker, to immediately place upon receipt, any money, fund, deposit, check, or draft entrusted to him by any person dealing with him as a broker, in escrow with a title company, banking institution, or savings and loan association located and doing business in this state, or to deposit such funds in a trust or escrow account maintained by him with some bank or savings and loan association located and doing business in this state, where the funds shall be kept until disbursements is properly authorized. . . .

Again, this is a situation where the Respondents were dealing with the Bowens not as real estate brokers but as owners selling their own property. Admittedly, Mr. Woodall cannot explain why he put the deposit in his brokerage trust account originally or why he drafted the contract to call for that action. In any event, though it was placed there for the short term, it has subsequently been reinvested in the form of a certificate of deposit and is available once a determination is made not by the Commission but by the courts that, in fact, the Bowens are entitled to a refund of the deposit. It has not been shown here that the Respondents have the obligation to maintain this money in a trust account and consequently, it cannot be said that they are guilty of this offense. See *LaRosa, et al. v. DPR, Division of Real Estate*, 474 So.2d 322 (3 DCA Fla. 1985).

In an administrative hearing convened under the provisions of Section 120.57(1), Florida Statutes, the burden of proof is on the party asserting the affirmative; *Baleno v. Department of Health and Rehabilitative Services*, 348 So.2d 349 (1st DCA Fla. 1977). It is incumbent upon the Petitioner to establish both that Respondent committed the acts alleged and, of equal importance, that those acts violate the statutory provisions cited in the Administrative Complaint.

This state has consistently recognized the importance of insuring that before an individual is deprived of his opportunity to earn a livelihood in the manner for which he or she was trained, the evidence of wrongdoing must be substantiated. *Bowling v. Department of Insurance*, 394 So.2d 165 (1st DCA Fla. 1981). See also, *Fisherman v. Department of Professional Regulation*, 441 So.2d 1121 (3d DCA Fla. 1983).

It appears that this case relates to an attempt to secure a return of a deposit for the Bowens rather than an attempt to discipline a broker

for improper conduct. If, in fact, the Woodalls are guilty of anything, it is simple negligence and a lack of professionalism. Neither of these is, however, a punishable offense under the Florida real estate statute and, as was stated above, the administrative hearing is not the proper forum to adjudicate the rights of the parties concerning ownership of the funds in question.

## *RECOMMENDATION*

Based on the foregoing Findings of Fact and Conclusions of Law, it is, therefore:

RECOMMENDED that the Administrative Complaint against the Respondents here be dismissed.

RECOMMENDED this 7th day of November, 1985, in Tallahassee, Florida.