428 So.2d 720 (1983)
Marshall J. BARKER, Appellant,
v.
BOARD OF MEDICAL EXAMINERS, DEPARTMENT OF PROFESSIONAL REGULATION, Appellee.
No. AH-306.
District Court of Appeal of Florida, First District.
March 9, 1983.
Bruce A. McDonald of Emmanuel, Sheppard & Condon, Pensacola, for appellant.
Jim Smith, Atty. Gen., and Chris D. Rolle, Asst. Atty. Gen., for appellee.
ERVIN, Judge.
This is an appeal from an order of the Board of Medical Examiners (Board) which denied appellant's application for licensure under Chapter 458, Medical Practice, Florida Statutes (1979), on the ground that he is not a graduate of a medical school or college approved by an accrediting agency which is recognized by the Department of Education. We affirm.
The issue before us is whether appellant "[i]s a graduate of a medical school or college maintaining a standard and reputation approved by the board pursuant to s. 458.311; ... ." Section 458.313(1)(c), Florida Statutes (1979) (pertaining to licensure by endorsement). Section 458.311(1)(b), Florida Statutes (1979), prescribing the requirements for licensure by examination, states that the medical school or college must be one "recognized and approved by an accrediting agency recognized by the United States Office of Education." Appellant is a graduate of the West Virginia School of Osteopathic Medicine, a school approved and accredited by the American Osteopathic Association (AOA), but not accredited by the American Medical Association (AMA). On appeal, the parties stipulated that the AOA is recognized as an accrediting body by the Council on Postsecondary Accreditation and the United States Office of Education (now the Department of Education). The issue then narrows to the question of whether the West Virginia School of Osteopathic Medicine is one approved by an accrediting agency recognized by the United States Office of Education (now the Department of Education) as a school of medicine?
*721 Following our initial examination of the record, consisting of certain exhibits, a transcription of a very brief proceeding before the Board relating to Barker's application for licensure, and a two-page stipulated statement, we determined that the omission of a section 120.57 hearing precluded meaningful appellate review of the issues; accordingly we relinquished jurisdiction to the Board for further consistent proceedings. The Board then requested a hearing officer from the Division of Administrative Hearings to conduct a section 120.57(1) hearing. The evidence before the hearing officer showed, through the testimony of the Board's executive secretary, that despite the nonexistence of any rule on the subject, it is the current policy of the Board to recognize only those medical schools or colleges approved by the Liaison Committee on Medical Education (LCME) of the Council of the American Medical Association. Also introduced into evidence were several exhibits, one revealing that the United States Department of Education recognizes separate accrediting agencies for medicine and osteopathic medicine, another disclosing that the Department of Education recognizes the LCME as the accrediting agency for medicine and the AOA as the accrediting agency for osteopathic medicine. Based upon this evidence, as well as his notice of the separate regulatory acts for the practices of medicine and osteopathic medicine, the hearing officer recommended that the licensing application be denied, which was accepted by the Board.
Appellant argues that the history of certain legislative changes that occurred during the 1979 legislative session, as well as of certain rule changes,[1] demonstrates that the legislature intended to allow qualified graduates of osteopathic medical colleges to become licensed under Chapter 458. Such legislative intent, he contends, is derived from the unqualified reference to medical school or college in section 458.311(1)(b), as simply being one "approved by an accrediting agency recognized by the United States Office of Education"; or, the fact that the school from which he graduated is approved by the AOA, an accrediting body recognized by the Department of Education, and finally, the failure of the legislature or the Board to reimpose standards requiring that the applicant graduate from a medical school approved by the AMA or other private organization. He concludes that this omission is significant when contrasted with the parallel provisions in the Osteopathy Act, also rewritten in 1979, which refers to the AOA.[2]
In denying appellant's applications, the Board obviously interpreted section 458.311(1)(b)'s reference to "medical school" as not encompassing a school of osteopathic medicine. Without expressly so stating, the Board apparently imposed the same criterion upon Barker that was previously required by Rule 21M-1.06: that the applicant graduate from a medical school "maintaining *722 a standard ... as that adopted by the Council on Medical Education and Hospitals of the American Medical Association...." Once again we are confronted with the question of whether an agency's policy, articulated by means other than by rule adoption, should be approved. It obviously would have been preferable for the Board to have expressed its policy by the adoption of a new rule, see, e.g., Anheuser-Busch, Inc. v. Department of Business, 393 So.2d 1177 (Fla. 1st DCA 1981); Bowling v. Department of Insurance, 394 So.2d 165 (Fla. 1st DCA 1981); Moncrief v. State, Commissioner of Insurance, 415 So.2d 785 (Fla. 1st DCA 1982). There was no lack of statutory authorization precluding the Board from defining by rule the term medical school or college simply because Section 458.08(1), Florida Statutes (1977) (permitting the Board to determine those medical schools or colleges which maintain a standard of training sufficient to admit their graduates to medical examinations), had been repealed at the time Barker applied for licensure. Section 458.313(1)(c), Florida Statutes (1979), although worded differently from section 458.08(1), authorizes the Board to approve the reputation and standards of medical colleges whose graduates seek licensure by endorsement within the state.
The fact, however, that no rule was extant at the time Barker applied for licensure does not necessarily mean the Board's action was void. The time has long since passed (if ever it existed) that agency action was mechanically invalidated simply because no rule was in effect. Certain opinions from this court during our early experience with Florida's 1974 Administrative Procedure Act may have so indicated. See Price Wise Buying Group v. Nuzum, 343 So.2d 115 (Fla. 1st DCA 1977); State, Department of Administration v. Stevens, 344 So.2d 290 (Fla. 1st DCA 1977), but contrast Mitchell v. School Board of Leon County, 347 So.2d 805 (Fla. 1st DCA 1977); Hill v. School Board of Leon County, 351 So.2d 732 (Fla. 1st DCA 1977), cert. denied, 359 So.2d 1215 (Fla. 1978). Our academic endeavors in attempting to label the action either rule or nonrule to determine whether or not it fell within section 120.52(14)'s definition of a rule have now been largely discarded. There are, however, costs exacted upon an agency which avoids the rulemaking procedure provided by section 120.54, chief among those being that the agency may be required repeatedly to defend its nonrule policy decisions in each case. State, Department of Administration v. Harvey, 356 So.2d 323, 326 (Fla. 1st DCA 1977).
Different standards of review are now applied to test the validity of an agency's nonrule action, and they stem largely from our seminal decision in McDonald v. Department of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977). McDonald instructs that in weighing the substantiality of evidence the appellate court should look to the form of the evidence appropriate to the issues before the agency. In so doing, the court first determines whether those issues are susceptible to ordinary methods of proof, i.e., dependent upon the weight and credibility of testimony, documentary evidence, etc.  facts which the agency claims no special insight. Or, are those issues resolvable as "interpretations of law, ... or policy within the agency's exercise of delegated discretion." Section 120.68(7), Florida Statutes (1981). Id. at 579. If the evidence falls within the former category, McDonald counsels that an appellate court should accord greater probative value to the findings of the trier of the facts, rather than to those of the reviewing agency. If, however, it falls into the latter,
a reviewing court will give correspondingly less weight to the hearing officer's findings in determining the substantiality of evidence supporting the agency's substituted findings.
Id. Yet, in those cases in which the agency's nonrule policy is not susceptible to verification by conventional proof, it is absolutely essential that such policy be sufficiently explained for agency review. Id. at 582.
McDonald, thus, more than any other case, established standards for reviewing the competency and persuasiveness of evidence supporting nonrule regulatory orders *723 in an adjudicative setting. It set the stage for future appellate decisions holding that the substantial evidence rule depends primarily upon the nature of the issues involved, and that evidence, substantial within one context, may not be so in another.
The McDonald rule was further refined by our later opinion in Anheuser-Busch, Inc. v. Department of Business. There we were asked to determine the validity of an agency's order which sought, without benefit of a rule, to interpret a statute which imposed licensee discipline "for violation of rather general, morally neutral, and somewhat technical statutory standards...." Id. 393 So.2d at 1181. Borrowing from the "record foundation" language of Florida Cities Water Co. v. Public Service Commission, 384 So.2d 1280, 1281 (Fla. 1980), we held that the nature of the issues involved  whether the licensee had breached the "Tied House Evil" Law by giving a gift or rebate to retail vendors  was required to be demonstrated by conventional proof, and because the Department's findings were susceptible to verification by means of such proof, we concluded that the order, which lacked such a foundation, must be set aside. 393 So.2d at 1184.
Later, we explicitly differentiated between evidence which may or may not substantially support nonpenal forms of regulatory action, and evidence which is required to support substantially a retrospective characterization of conduct requiring suspension or revocation of the actor's license. See Bowling v. Department of Insurance. The test to be applied in the latter instance is for the agency to prove "the critical matters in issue ... by evidence which is indubitably as `substantial' as the consequences." Id. 394 So.2d at 172. One of the specific issues before the court in Bowling was whether an insurance agent was required to remit to the servicing carrier on a daily basis premium money that he had received. We determined that this issue was capable for resolution by adjudicative facts  facts which are "devoid of `policy considerations for which the agency has special responsibility ...'", id. at 174  rather than by legislative facts.[3] Because the finding answering that critical issue was again unsupported by an appropriate foundation, the order of license revocation was vacated.
Finally, our examination of orders involving an agency's nonrule interpretation of a nonpenal regulatory statute involves yet again different standards of review from those applied in cases involving the substantiality of evidence supporting penal orders in which no statutory interpretation is implicated. Thus, in ABC Liquors, Inc. v. Department of Business Regulation, 397 So.2d 696, 697 (Fla. 1st DCA 1981), we stated:
When in Section 120.57 proceedings to construe and apply a nonpenal regulatory statute an independent hearing officer and the agency agree on a dispositive finding, there is little cause for a district court of appeal to debate whether the matter in issue is more nearly adjudicative fact or statutory policy and whether the hearing officer's or the agency's finding must prevail. See McDonald v. Dept. of Banking and Finance, 346 So.2d 569, 579 (Fla. 1st DCA 1977). In such a case our task is only to assure that the affected party was protected by adherence to Chapter 120 processes, that the dispositive finding is supported by substantial competent evidence appropriate to the issue, and that the agency was not "clearly erroneous or unauthorized," Gay v. Canada Cry Bottling Co. of Florida, Inc., 59 So.2d 788, 790 (Fla. 1952), in interpreting the statute given in its charge to enforce.
In the instant case, the critical finding, which involved essentially an interpretation *724 of section 458.313(1)(c), that Dr. Barker did not graduate from a medical school approved by the Board was reached by both the hearing officer and the agency. In examining the record which is appropriate to the issue, we find that it consists of a combination of both statutory policy and conventional proof. The statutory policy, or legislative facts, recited in the hearing officer's recommended order, convincingly displays the legislative intent that the two professions have separate disciplines and educational requisites. For example, Section 458.305(3), Florida Statutes (1979), defines the practice of medicine as "the diagnosis, treatment, operation, or prescription for any human disease, pain, injury, deformity, or other physical or mental condition." On the other hand, Section 459.003(3), Florida Statutes (1979), while defining the practice of osteopathic medicine in the same terms as those provided in section 458.305(3), continues with the following language: "[W]hich practice is based in part upon educational standards and requirements which emphasize the importance of the musculoskeletal structure and manipulative therapy in the maintenance and restoration of health." Indeed, Section 459.002, Florida Statutes (1979), provides generally that Chapter 459 is not applicable to the practice of medicine, surgery, chiropractic, etc. Additionally, Section 459.006(1)(b), Florida Statutes (1979), requires that an applicant, among other things, submit proof that he is "a graduate of a college of osteopathic medicine recognized and approved by the American Osteopathic Association." Although a physician is defined as "a person who is licensed to practice medicine in this state," Section 458.305(4), Florida Statutes (1979), an osteopathic physician is defined as one "who is licensed to practice osteopathic medicine in this state." Section 459.003(4), Florida Statutes (1979). Thus, we find by referring solely to the above statutory provisions that the practice of osteopathic medicine is significantly different from that of medicine.
Indeed, the distinctions are further legislatively recognized in Section 381.494(2), Florida Statutes (1979) (relating to the requirements that one must set out in an application for a certificate of need for an osteopathic facility), in Section 395.0653(1), Florida Statutes (1979), (prohibiting licensed hospitals from denying staff membership to qualified doctors of osteopathy), and in Section 395.011(2), Florida Statutes (Supp. 1982) (forbidding a licensed health care facility from discriminating against a graduate of a program approved by the AOA once it has granted staff membership to a graduate "from any program ... established by ... the American Medical Association or the Liaison Committee on Graduate Medical Education... .").[4]
These distinctions were judicially observed by us in Gulf Coast Hospital, Inc. v. Department of Health and Rehabilitative Services, et al., 424 So.2d 86 (Fla. 1st DCA 1982) (footnotes omitted):
[O]steopathy and allopathy are two primary and separate schools of medicine which differ substantially in philosophy and practice, ... . Osteopathic facilities may not differ significantly as to physical plant and equipment but are highly distinctive because of the purpose for which they are constructed and maintained. That purpose includes the care and treatment of patients in accordance with the principles of osteopathy, the teaching and the study of osteopathic medicine, and the association in practice of doctors of osteopathy, including osteopathic specialists, with support from staff personnel suitably trained in the principles and philosophy of osteopathy. The management and control of the facility so as to actively further all of the above activities rather than to merely tolerate them, must be in the hands of osteopaths or those sympathetic to that school of medicine.
In addition to evidence involving statutory policy, or policy considerations which the agency claims special insight within its exercise *725 of delegated discretion, the hearing officer had before him conventional proof in the form of documentary evidence to support the dispositive finding. For example, an exhibit admitted into evidence discloses that the United States Department of Education recognizes separate accrediting agencies for "medicine"[5] and "osteopathic medicine" as reliable authorities concerning the quality of education or training offered by educational institutions. Another exhibit, entitled "Accredited Postsecondary Institutions and Programs," a publication of the Department of Education, acknowledges the LCME and the Executive Council of the Association of American Medical Colleges as the accrediting agency for medicine, and the AOA as the accrediting agency for osteopathic medicine. Finally, in the AMA's list of schools offering accredited programs leading to the MD degree in the United States, the West Virginia School of Osteopathic Medicine is not so named.
The evidence, appropriate to the issue before the Board, thus fully supported the dispositive finding, agreed upon by both the hearing officer and the agency, that Dr. Barker did not graduate "from a medical school or college ... [which was] approved by the [B]oard... ." Because that finding was neither clearly erroneous nor unauthorized, it must be
AFFIRMED.
ROBERT P. SMITH, Jr., C.J., and SHAW, LEANDER J., Jr., Associate Judge, concur.
NOTES
[1] Prior to the date appellant filed his application for licensure by endorsement on July 21, 1981, Section 458.051(1)(c), Florida Statutes (1977), the predecessor statute to Section 458.313(1)(c), Florida Statutes (1979), provided that the applicant must be "a graduate of a medical school or college maintaining a standard and reputation approved by the board pursuant to s. 458.08; ... ." Section 458.08(1), Florida Statutes (1977), in turn authorized the Board to "pass upon the good standing and reputability of any medical school or college and determine those which maintain a standard of training sufficient to admit their graduates to the medical examinations given by the said Board."

Pursuant to the above statutory authorizations, the Board adopted Florida Administrative Code Rule 21M-1.06, defining an approved medical school or college as one "maintaining a standard and reputability as that adopted by the Council on Medical Education and Hospitals of the American Medical Association and the Association of American Medical Colleges." Sections 458.051 and 458.08 were repealed by the 1979 legislature, effective July 1, 1979. See Ch. 79-302, § 5, Laws of Fla. And, on March 31, 1980, Rule 21M-1.06 was repealed by the Board. As a result, at the time appellant applied for licensure, no definitions of medical school were extant in either the Florida statutes or the Board's rules.
[2] See Section 459.006(1)(b), Florida Statutes (1979), pertaining to licensure by examination, requiring that the applicant be "a graduate of a college of osteopathic medicine recognized and approved by the American Osteopathic Association."
[3] The distinction between the two is stated as follows:

"Adjudicative facts are the facts about the parties and their activities, businesses and properties.... Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion."
Bowling, 394 So.2d at 174, n. 17 (quoting from 1 Davis, Administrative Law Treatise, Section 7.02 at 413).
[4] Although both Sections 395.0653(1) and 395.011(2) have as their aim the avoidance of discrimination against doctors of osteopathy, they nevertheless support our thesis that the legislature continues to observe the distinctions between the two disciplines.
[5] Perhaps it would be more accurate to modify the noun "medicine" with the adjective "allopathic". Allopathy is defined in Webster's Third New International Dictionary as "a system of medical practice that aims to combat disease by use of remedies producing effects different from those produced by the special disease treated."