477 So.2d 1039 (1985)
Ben COHN, Appellant,
v.
DEPARTMENT OF PROFESSIONAL REGULATION, Appellee.
No. 84-1217.
District Court of Appeal of Florida, Third District.
October 22, 1985.
*1040 Mark Krasnow, Miami, for appellant.
Bruce Lamb, Tallahassee, for appellee.
Before SCHWARTZ, C.J., and BASKIN and JORGENSON, JJ.
SCHWARTZ, Chief Judge.
This is an appeal from a final order of the Board of Pharmacy which, contrary to the recommendation of the hearing officer that the charges against him be dismissed, revoked Cohn's license to practice pharmacy. *1041 For the reasons which follow, we vacate the order and remand the cause initially for further proceedings before the hearing officer and for any appropriate review thereafter.

Facts and Proceedings Below
The case began when the Department of Professional Regulation filed an administrative complaint against Cohn charging him with dispensing a controlled substance, methaqualone  quaaludes  in such quantities as to demonstrate a lack of "good faith" and a departure from the "course of professional practice." The DPR claimed that this conduct violated sections 465.016(1)(i) and 893.04(1), Florida Statutes (1981):
465.016 Disciplinary actions. 
(1) The following acts shall be grounds for disciplinary action set forth in this section:
* * * * * *
(e) Violating any of the requirements of this chapter; chapter 500, known as the "Florida Food, Drug, and Cosmetic Law"; 21 U.S.C. ss. 301-392, known as the "Federal Food, Drug, and Cosmetic Act"; or chapter 893.
* * * * * *
(i) Compounding, dispensing, or distributing a legend drug, including any controlled substance, other than in the course of professional practice of pharmacy. [e.s.].
893.04 Pharmacist and practitioner. 
(1) A pharmacist, in good faith and in the course of professional practice only, [e.s.] may dispense controlled substances upon a written or oral prescription of a practitioner, under the following conditions: ... .
The evidence at the hearing established that between August 4, 1981 and January 6, 1982, in the period just before the legal dispensing of methaqualone was barred in Florida[1]  Cohn was employed as a pharmacist at Don's Discount Drugs in Dade County. During that time, the pharmacy, which was one of only ten in the county which would dispense the notorious drug at that time under any circumstances,[2] filled 4,695 quaalude prescriptions for 202,404 300 mg. tablets. Of these, Cohn himself filled 2,724 prescriptions, 55% of the total, for 118,130 tablets. Cohn stated without contradiction that he kept an index file to assure that no one customer filled repeated prescriptions for the drug and that he individually verified the licensed status and the drug enforcement agency number of each physician whose quaalude prescriptions he filled. He acknowledged, however, that (a) quaaludes had a high potential for abuse and that their "street value" was higher for that reason, (b) as many as eighteen separate patients per day presented quaalude prescriptions written by the same doctor in the same quantity, and (c) he was aware that a number of physicians in the area were practicing in so-called "stress clinics" whose primary function seemed to be the indiscriminate prescribing of quaaludes.[3] Notwithstanding all of this and although he recognized that individuals might be purchasing the drug for improper purposes, he justified his dispensing the quaaludes by stating that "not being able to buy it at the drug store was not going to stop them," and that "in some way I think it is more good than having them go out on the street and buy them."
Although there was no statute or rule that specifically precluded his activities, and Cohn met each of the particularized regulatory provisions of section 893.04,[4] the DPR presented *1042 the testimony of an expert witness, Louis Fisher, who was both a licensed pharmacist and an investigator for the DEA. He opined that Cohn's dispensing of quaaludes in the quantities and under the circumstances involved was nonetheless not in "good faith" or "in the course of professional practice."[5]
In the recommended order, the hearing officer found the undisputed, historical facts concerning the number and quantity of quaaludes Cohn dispensed during the relevant period.[6] She concluded, however, that in the absence of any violation of a specific statute or rule,[7] Cohn could not, as a matter of law, be subjected *1043 to discipline for the manner in which he filled apparently appropriate prescriptions written by duly licensed physicians; putting it another way, she held that a pharmacist necessarily acts in "good faith and in the course of professional practice" in filling prescriptions when, as Cohn did, he complies with the conditions in that regard contained in section 893.04. The officer specifically declined, on the ground that such a determination would be legally irrelevant, to make any finding as to whether Cohn violated, as Fisher testified, any generalized standard of "good faith" and "professional practice."[8] Accordingly, she recommended dismissal of the charges.
On review, the Board of Pharmacy made two critical decisions  one of law and one of fact  which underlay the order of revocation now before us. In its legal determination  with which we concur  it concluded that, under the applicable statutes, a mere compliance with the terms of section 893.04 and any other existing rule does not insulate a pharmacist from appropriate discipline if his conduct otherwise lacks "good faith" or departs from the requirements of "professional practice." In this regard, it said:
Not only must a pharmacist be assured that the controlled substance in question meets the standards of Ch. 893 as regards to the former prescription, the manner in which the prescription is to be filled, the labeling requirements for the container in which the medication is dispensed and record keeping requirements for the pharmacist in filling the prescription but also such dispensing should be in the course of the professional practice whether or not the actual format of the prescription is met. In other words, a pharmacist must not be permitted under the guise of having received a prescription or many prescriptions from a licensed prescriber to fill such prescription(s) when based upon his training and experience and all of the facts surrounding the prescription(s) it is clear that such prescription or prescriptions taken as a whole have been written outside the course of professional practice of pharmacy and would do harm to the patient or public.
Upon this view of the law, the Board went on to conclude, as a matter of fact, as follows:
Based upon the expertise of the members of the Board of Pharmacy and the facts of this case it is determined that the practice of Respondent was not in the course of professional practice.

Discipline Permissible for Conduct Contrary to Good Faith and Professional Practice Although Not Violative of Specific Statute or Rule
Cohn's primary argument for reversal is essentially the same as the basis of the conclusion of the hearing officer. He contends that the demands both of due process and appropriate statutory construction preclude discipline when, as here, the professional's conduct contravenes no particularized statute or rule and is only subsequently claimed to have violated such amorphous standards as those requiring "good faith" or conduct "in the course of professional practice;" he says, in a word, that it is fundamentally unfair to punish him for something he had no reasonable way to know ahead of time was wrong. While the *1044 contention is certainly not unsubstantial,[9] we cannot agree that the law of Florida permits its acceptance.
A prominent aspect of the appellant's argument, that, standing alone, nonspecific requirements of "good faith" and "professional practice," are unconstitutionally vague as inadequate to meet due process standards of prior fair notice  is plainly unsupportable in the light of State v. Weeks, 335 So.2d 274 (Fla. 1976). In Weeks, the supreme court rejected the claim that a criminal statute, section 893.03(2)(c)(1), which forbids the delivering of a controlled substance by a physician through an order "not issued in good faith," was void for vagueness. The court said:
Applying "our own knowledge with which observation and experience have supplied us," we find that the language employed by the instant statute conveys [a] sufficiently definite meaning "that a person who may be liable to the penalties of the act may know that he is within its provisions or not." We note that many courts of other jurisdictions have reached the same result in cases involving the construction of virtually identical language.
* * * * * *
We are persuaded by the unanimous authority arrayed against the proposition that the term "good faith" is unconstitutionally vague.
335 So.2d at 277. Weeks presents an a fortiori situation to the administrative case before us. See also State, Department of Citrus v. Griffin, 239 So.2d 577 (Fla. 1970); Solimena v. State, Department of Business Regulation, 402 So.2d 1240 (Fla. 3d DCA 1981), pet. for review denied, 412 So.2d 470 (Fla. 1982). Indeed, numerous Florida decisions and those from other jurisdictions make clear that discipline may be imposed for violations of equally, if not even more facially uncertain standards than those contained in sections 465.016 and 893.04. E.g., Purvis v. Department of Professional Regulation, 461 So.2d 134 (Fla. 1st DCA 1984); Barker v. Board of Medical Examiners, 428 So.2d 720 (Fla. 1st DCA 1983); Bowling v. Department of Insurance, 394 So.2d 165 (Fla. 1st DCA 1981); Megdal v. Oregon State Board of Medical Examiners, 288 Or. 293, 605 P.2d 273, 275-76 (1980) ("Unprofessional conduct" adequate standard for discipline, even assuming insufficient for criminal prosecution, but see Weeks.); State ex rel. Lentine v. State Board of Health, 334 Mo. 220, 65 S.W.2d 943 (1933); In re Hawkins, 17 N.C. App. 378, 194 S.E.2d 540, 550-51 (1973), cert. denied, 283 N.C. 393, 196 S.E.2d 275 (1973), cert. denied, 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237 (1973); Vivian v. Examining Board of Architects, 61 Wis.2d 627, 213 N.W.2d 359, 366-67 (1974). When such a violation is alleged, it is apparent that there need be no rule explicitly proscribing the allegedly improper conduct of the licensee. In Barker, the court specifically held:
The fact, however, that no rule was extant at the time Barker applied for licensure does not necessarily mean the Board's action was void. The time has long since past (if ever it existed) that agency action was mechanically invalidated simply because no rule was in effect.
428 So.2d at 722. See generally Astral Liquors, Inc. v. Department of Business Regulation, 463 So.2d 1130 (Fla. 1985); Dickinson v. State, 227 So.2d 36, 37 (Fla. 1969) ("The exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulating enactments under the police power."); Department of Business Regulation v. Jones, 474 So.2d 359 (Fla. 1st DCA 1985), and cases cited; Burgess v. Florida Department of Commerce, 436 So.2d 356, 358 (Fla. 1st DCA 1983), pet. for *1045 review denied, 447 So.2d 885 (Fla. 1984), and cases cited.
It also follows  addressing the precise situation involved in this case  that the licensee's compliance with any specific statutes or rules which do exist concerning the particular conduct involved, such as are arguably contained in section 893.04, does not prevent the imposition of discipline if the licensee otherwise violates the general requirements of the applicable statute. This conclusion is supported by the overwhelming weight of authority on the subject. Thus, in Lentine, supra, a doctor's license was revoked for having participated in a scheme to sell medical licenses. Relying upon a statute similar to section 465.016, the State Board of Health deemed this activity "unprofessional and dishonorable" although the sale of medical licenses was not among the specifically enumerated acts of unprofessional conduct listed in the statute. The Supreme Court of Missouri upheld the Board, noting that by particularizing certain acts the legislature did not intend
to thereby exclude all other acts or conduct affecting the practice of medicine and the moral conduct of the physician, in that connection, which, by common opinion and fair judgment are bound to be in their very nature unprofessional and dishonorable, as grounds or cause for revocation of a license. Rather upon a showing of any of the things enumerated the Board of Health, and the court upon review, is not called upon in its sound discretion to determine whether such conduct is such as in common judgment is deemed unprofessional and dishonorable, for the statute has expressly declared it so to be. It would not be practicable to the carrying out of the wholesome purpose of the statute to undertake to catalog, list, or specify each and every act or course of conduct which would, or under what circumstances, constitute bad moral character or unprofessional and dishonorable conduct, and we do not think the Legislature intended to do so.
65 S.W.2d at 950.
Similarly, in Kansas State Board of Healing Arts v. Foote, 200 Kan. 447, 436 P.2d 828 (1968), the state board revoked a physician's license for "extreme incompetence" despite the fact that extreme incompetence was not one of 15 specific acts constituting "unprofessional conduct" under the governing statute. In affirming, the court said:
Considering the entire policy expressed in the act, we believe the legislature, by enumerating certain acts and classifying them as unprofessional conduct, did not thereby intend to exclude all other acts or conduct in the practice of the healing arts which by common understanding render the holder of a license unfit to practice. It would indeed be difficult, not to say impractical, in carrying out the purpose of the act, for the legislature to list each and every specific act or course of conduct which might constitute such unprofessional conduct of a disqualifying nature.
436 P.2d at 833.
To the same effect is the leading case of Matter of Heller, 73 N.J. 292, 374 A.2d 1191 (1977), in which the facts were uncannily similar to ours. Upon an extensive and well reasoned analysis, the court held that a pharmacist who dispensed an excessive quantity of codeine syrup was properly disciplined for "grossly unprofessional conduct" even though his action did not fall within any of the categories which were specifically defined as such in the applicable statute. Accord, Bell v. Board of Regents, 295 N.Y. 101, 65 N.E.2d 184, 187 (1946) ("It has never been necessary for the Legislature ... to define with particularity acts which would constitute unprofessional conduct... ."); see Talman v. Department of Registration and Education, 78 Ill. App.3d 450, 33 Ill.Dec. 818, 397 N.E.2d 151 (1979) (pharmacist filling excessive cough syrup prescriptions violated standard of "good faith"); see also Cotovsky v. Department of Registration and Education, *1046 110 Ill. App.3d 417, 66 Ill.Dec. 94, 442 N.E.2d 520 (1982); Vermont & 110th Medical Arts Pharmacy v. Board of Pharmacy, 125 Cal. App.3d 19, 177 Cal. Rptr. 807 (1981); cases collected Annot., Revocation or Suspension of License or Permit to Practice Pharmacy or Operate Drug Store Because of Improper Sale or Distribution of Narcotic or Stimulant Drugs, 17 A.L.R.3d 1408, 1419-20 (1968); contra, Pennsylvania State Board of Pharmacy v. Cohen, 448 Pa. 189, 292 A.2d 277 (1972).[10]
Thus, we agree with the Board that it has the authority to discipline Cohn upon a proper finding that his activities were not in "good faith" or "in the course of professional practice."[11]

Board's Independent Finding of Violation Improper
We most assuredly, however, cannot approve of the manner in which the Board reached that conclusion below. As has been seen, the hearing officer, based upon what we have concluded is an erroneous view of the law, made no finding at all concerning this issue. Notwithstanding, the Board invoked the asserted expertise of its members, presumably as pharmacists themselves, to determine that Cohn's actions were "not in the course of professional practice." This conclusion was totally unauthorized and improper.
In the first place, it is settled Florida doctrine that the rule which ascribes effect to an agency's determination of ultimate "facts" on a subject about which it may rightfully claim expert insight, which originated in McDonald v. Department of Banking and Finance, 346 So.2d 569, 579 (Fla. 1st DCA 1977), is not applicable to disciplinary proceedings in general, and to ones like this which are based upon an alleged breach of a broad standard of conduct in particular. In such an instance, the issue of whether the licensee's conduct was indeed in violation of a statutory standard is one of fact which not only must be established by "conventional" proof, but as to which the prosecuting agency bears a significantly enhanced burden. As the first district recently made clear in Purvis:

McDonald involved an application for authority to organize and operate a bank. While we do not question the validity of the proposition quoted from McDonald, neither do we agree that it is applicable in this proceeding to discipline a professional for impermissibly deviating from accepted standards of conduct. In disciplinary proceedings of this nature, the Board has the burden of proving the applicable standard of conduct by competent substantial evidence, and there is a substantial difference between "evidence which `substantially' supports conventional forms of regulatory action and evidence which is required to support `substantially' a retrospective characterization of conduct requiring suspension or revocation of the actor's license." Bowling v. Department of Insurance, 394 So.2d 165, 171 (Fla. 1st DCA 1981). In Bowling, the court emphasized:
Rather, we glean a requirement for more substantial evidence from the very nature of licensee discipline proceedings: when the standards of conduct to be enforced are not explicitly fixed by statute or by rule, but depend on such debatable expressions as `in the applicable regular course of business'; when the conduct to be assessed is past, beyond the actor's power to conform it to agency standards announced prospectively; and when the proceeding may result in the loss of a valuable business or professional license, *1047 the critical matters in issue must be shown by evidence which is indubitably as `substantial' as the consequences. [Id. at 172].
461 So.2d at 137. Accord, Barker, supra.[12]
On this basis, it is clear that an agency's reliance upon its own expertise to reverse a hearing officer's finding of no violation may not be sustained. Heifetz v. Department of Business Regulation, 475 So.2d 1277 (Fla. 1st DCA 1985); Purvis, supra; Johnston v. Department of Professional Regulation, 456 So.2d 939 (Fla. 1st DCA 1984); Sneij v. Department of Professional Regulation, 454 So.2d 795 (Fla. 3d DCA 1984). For the same reason, the Board's attempt below to make such a finding ab initio in the absence of any determination by the hearing officer on this point must likewise fall. Indeed, there is no authority for any agency to make an independent determination of disputed fact in a review proceeding like this under any circumstances; it may only consider whether findings actually made are sustained by the evidence; section 120.57(1)(b)(9), Florida Statutes (1983); and whether, if so, they support the recommended conclusions. When the entity charged with finding facts upon the evidence presented, the hearing officer, has, for whatever reason, failed to perform this function, the appropriate remedy is not for the agency (or the court of appeal) to reach its own conclusion, but rather to remand for the officer to do so. This was the holding in Gentile v. Department of Professional Regulation, 448 So.2d 1087 (Fla. 1st DCA 1984). There, an applicant had been denied a medical license by the Board of Medical Examiners. During a subsequent hearing, the hearing officer took testimony regarding his truthfulness during the application process, but failed to make a finding of fact on the subject because she was uncertain as to whether one was appropriate. Id. at 1089. Upon review, the Board accepted all the findings below but added one of its own that Gentile was in fact not truthful. Solely on this basis, the Board found that he was not of good moral character nor capable of safely engaging in the practice of medicine. Id. The first district vacated the Board's determination and remanded for further evidentiary hearing and resolution of the truthfulness issue by the hearing officer. Id. at 1090. We deem it appropriate to follow the same course here.

Conclusion
For the reasons stated, the order of revocation is vacated. The cause is remanded (a) for further administrative hearing, to be conducted in accordance with this opinion,[13] on the issue of whether Cohn acted in good faith and in the course of professional practice; (b) for the hearing officer's entry of findings of fact and conclusions of law thereon; and (c) for any further appropriate proceedings.
Vacated, remanded with directions.
BASKIN, J., concurs.
JORGENSON, Judge, concurring in part and dissenting in part.
I agree that the Board of Pharmacy's order revoking Cohn's license should be vacated. I emphatically disagree and, therefore, respectfully dissent from that portion of the court's opinion which remands this cause for further proceedings. I do so for two separate reasons.
Firstly, the cases upon which the court principally relies are inapposite. State v. Weeks, 335 So.2d 274 (Fla. 1976), involved a physician. In the physician context, "good faith" can be sufficiently defined. See Weeks, 335 So.2d at 277. In the pharmacist *1048 context, no definition of "good faith" has yet been proffered by the legislature, the Department of Professional Regulation, or this court. Indeed, at oral argument, counsel for the Department conceded that the Department had attempted, but was unable, to promulgate sufficient guidelines in this area.
Contrary to the court's characterization of the facts in Matter of Heller, 73 N.J. 292, 374 A.2d 1191 (1977), as "uncannily similar to ours," I think the facts are significantly dissimilar. In Heller, the pharmacist, whose license was revoked, dispensed without prescription a large quantity of a codeine-based cough syrup at grossly inflated prices. No order from a physician was implicated in that case, and, thus, the pharmacist was not being asked to second guess the physician.
Megdal v. Oregon State Board of Dental Examiners, 288 Or. 293, 605 P.2d 273 (1980) (in banc), is easily distinguished. Megdal involved an "unprofessional conduct" standard, not a "good faith" standard. Moreover, the underlying conduct sought to be penalized in that case constituted unlawful activity independent of any prohibitions against "unprofessional conduct." (The dentist had made intentional misrepresentations to his malpractice insurer.)
Secondly, and perhaps most importantly, the policy implications of requiring a pharmacist to second guess the medical judgment of a physician who has made a decision to prescribe a controlled substance are simply overwhelming. Such a policy would make the pharmacist the ultimate health care provider. That cannot be the law, nor is it contemplated by the statutory scheme. The Board of Pharmacy cannot constitutionally revoke a pharmacist's license under the facts of this case.[1] As the court acknowledges, there was no statute or rule that specifically precluded Cohn's activities and, further, he met each of the regulatory provisions of section 893.04(1), Florida Statutes (1983) (see majority opinion at 1041). The new law which the court directs that the hearing examiner apply is post facto, subjective, and constitutionally infirm. See Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939).
We can learn much of what is expected of pharmacists by briefly analyzing leading negligence cases dealing with a pharmacist's liability to a patient-consumer. In McLeod v. W.S. Merrell Co., Div. of Richardson-Merrell, Inc., 174 So.2d 736 (Fla. 1965), our supreme court rejected the notion that a pharmacist could be held strictly liable in tort and established the negligence standard upon which liability can be found. The court held that
the responsibilities of the retail prescription druggist can be imposed, under the concept that a druggist who sells a prescription warrants that (1) he will compound the drug prescribed; (2) he has used due and proper care in filling the prescription (failure of which might also give rise to an action in negligence); (3) the proper methods were used in the compounding process; (4) the drug has not been infected with some adulterating foreign substance.
McLeod, 174 So.2d at 739. In reaching this conclusion, the court stated: "Obviously, the patient-purchaser did not rely upon the judgment of the retail druggist in assuming that the drug would be fit for its intended purpose. This confidence had been placed in the physician who prescribed the remedy." McLeod, 174 So.2d at 739 (emphasis added). Similarly, the fourth district, relying on McLeod, held that a pharmacist had no duty to warn a consumer or his physician with respect to the addictive propensity of quaaludes, notwithstanding the pharmacist's actual or constructive knowledge of the consumer's dependency and addiction. Pysz v. Henry's Drug Store, 457 So.2d 561 (Fla. 4th DCA 1984). In so doing, the court held that "it is the physician who has the duty to know the drug that he is prescribing and to properly monitor the patient." Pysz, 457 So.2d at 562 (emphasis added). The result the *1049 court reaches unnecessarily inserts the pharmacist (as a policeman) into the physician-patient relationship.
The decision of weighing the benefits of a medication against potential dangers that are associated with it requires an individualized medical judgment. This individualized treatment is available in the context of a physician-patient relationship which has the benefit of medical history and extensive medical examinations. It is not present, however, in the context of a pharmacist filling a prescription for a retail customer. The injection of a third party in the form of a pharmacist into the physician-patient relationship could undercut the effectiveness of ongoing medical treatment.
Health & Hospital Corp. v. Marion County, ___ Ind. App. ___, 476 N.E.2d 887 (1985) (emphasis added). The entire statutory scheme places the physician at the apex of health care decision making. All other health care providers are expected to follow orders.
If pharmacists are to be required to second guess the medical judgment of duly authorized treating physicians (a concept hitherto unknown in the law), fundamental notions of due process require that the legislature or the Board announce that fact. Cf. Lanzetta, 306 U.S. at 453, 59 S.Ct. at 619, 83 L.Ed. at 890. The good faith "standard" which the court adopts today creates a slippery slope for the pharmacist. It is incomprehensible to me how a pharmacist can know precisely at what point in his filling of lawful prescriptions he will be deemed to have fallen from grace by filling too many lawful prescriptions.
If the evil sought to be cured is the eradication of "stress clinics" or the discovery of over-prescribing physicians, it would be a relatively easy thing for the Board to issue a rule either requiring pharmacists to report instances of what, under objective criteria, has been determined to be inappropriate prescription writing by physicians or directing pharmacists not to honor prescriptions from certain identified physicians. No such rule is present in this case.
Although I agree that the good faith standard can apply to pharmacists when the exercise of independent judgment is at issue,[2]see Heller, good faith can never be an issue where, as here, the only record default was that the pharmacist followed doctor's orders.

APPENDIX

 STATE OF FLORIDA
 DIVISION OF
 ADMINISTRATIVE HEARINGS
 DEPARTMENT OF PROFESSIONAL
 REGULATION, BOARD OF
 PHARMACY, Petitioner,
 vs.
 BEN COHN, Respondent.
 CASE NO. 82-2161
 RECOMMENDED ORDER
 Pursuant to notice, this cause was heard by Linda M. Rigot, the
assigned Hearing Officer of the Division of Administrative
Hearings, on June 21, 1983, in Miami, Florida.
 Petitioner Department of Professional Regulation, Board of
Pharmacy was represented by W. Douglas Moody, Esquire,
Tallahassee, Florida, and Respondent Ben Cohn was represented by
Mark Krasnow, Esquire, Miami, Florida.
 Petitioner filed an Administrative Complaint seeking to
suspend, revoke, or take other disciplinary action against
Respondent as licensee and against his license to practice
pharmacy under the laws of the State of Florida. Respondent
timely requested a formal hearing on the allegations contained
within that Administrative Complaint.
*1050 Accordingly, the issues for determination are whether Respondent
is guilty of the charges contained within that Administrative
Complaint and, if so, what disciplinary action should be taken,
if any.
 Petitioner presented the testimony of Louis Fischer and Sidney
Simkowitz. Additionally, Petitioner's Composite Exhibits numbered
1 and 2 were admitted in evidence. The Respondent testified on
his behalf.
 Although both parties requested and were granted leave to file
proposed findings of fact, only Petitioner submitted post-hearing
proposed findings of fact in the form of a proposed recommended
order. To the extent that any proposed findings have not been
adopted in this Recommended Order, they have been rejected as not
having been supported by the evidence, as having been irrelevant
to the issues under consideration herein, or as constituting
unsupported argument of counsel or conclusions of law.
 FINDINGS OF FACT
 1. Respondent is a pharmacist under the laws of the State of
Florida, having been issued license number 0009536.
 2. At all times material hereto, Respondent was employed by
Don's Discount Drugs in South Miami, Florida.
 3. A drug diversion audit of all Schedule II prescriptions
filled at Don's Discount Drugs was initiated by the Petitioner
and covered a period from August 4, 1981, through January 6,
1982. The audit revealed that during that time period there were
202,404 methaqualone 300 mg. tablets (Quaaludes) dispensed on
4,695 prescriptions.
 4. Respondent dispensed 118,130 of the noted methaqualone
tablets on 2,724 prescriptions, or approximately 55 percent of
the total methaqualone dispensed.
 5. At the time, methaqualone was designated as a Schedule II
substance.
 6. All of the prescriptions in question were written by
prescribers with medical licenses issued by the Board of Medical
Examiners.
 7. In filling each of the methaqualone prescriptions in
question, Respondent followed his standard procedure for the
filling of any Schedule II drug prescription. As to each
prescription, Respondent verified that the person bringing the
prescription to him was the person to whom the prescription was
written by requiring that person to produce a driver's license or
a photo identification with a name on it. Respondent then
contacted the United States Department of Justice Drug
Enforcement Administration to verify that the prescriber had a
legitimate DEA number and that the number had not expired. If the
number had expired, Respondent would not fill the prescription.
Respondent then verified with the prescriber that that
prescription had been written for that patient and verified the
number of tablets reflected on the prescription. Respondent then
made a notation on the prescription itself that the verifying
telephone calls had been made. Lastly, Respondent placed that
patient's name and address on an index card together with the
name of the doctor and the date of the prescription and put that
card in a special file to use as a reference to prevent
dispensing Schedule II drugs to that person as a result of
multiple prescriptions from the same doctor in too short a time
period and to prevent the same patient from presenting similar
Schedule II drug prescriptions from different doctors.
 8. During the time in question, it was legal in the State of
Florida to prescribe and to dispense methaqualone. However, of
the approximate 400 community pharmacies in Dade County only
approximately ten of those community pharmacies would fill a
methaqualone prescription.
 9. None of the prescriptions in question is written for an
excessive number of methaqualone tablets. Additionally, no
allegation has been made that any one patient was dispensed an
excessive number of methaqualone tablets. Further, no allegation
has been made that Respondent violated any packaging, labeling,
or record-keeping
*1051 requirements for the proper dispensing of prescriptions. Lastly,
none of the prescriptions in question was dispensed pursuant to
an oral prescription; rather, each prescription filled was
written by the prescriber, and that written prescription was
retained by Don's Discount Drugs in its Schedule II drug files.
Petitioner's audit revealed that all prescriptions were signed
and dated by the medical practitioner and had the full name and
address of that prescribing practitioner and his federal
controlled substance registering number on the face of the
prescription; each prescription bears the initials and license
number of the pharmacist filling that prescription; each
prescription was properly retained as required by law; each
container into which the medication was placed had a label
bearing the appropriate information as to the name and address of
the pharmacy, the date prescribed, the name of the prescriber,
the number of the prescription, the name of the patient, and
directions for use.
 10. No evidence was presented comparing the total number of
Quaalude prescriptions filled at Don's Discount Drugs to the
total number of Quaalude prescriptions filled in Dade County at
the time. No evidence was presented comparing the number of
methaqualone prescriptions filled at Don's Discount Drugs to the
total number of prescriptions filled at that community pharmacy.
No evidence was presented comparing the number of methaqualone
prescriptions written by each of the prescribers to the total
number of prescriptions for all medication written by those same
prescribers.
 11. Respondent has been a practicing pharmacist in the State of
New York since 1945 and in the State of Florida since 1961. He
has never been disciplined and has never had an Administrative
Complaint filed against him regarding his practice of pharmacy
other than the instant Administrative Complaint.
 CONCLUSIONS OF LAW
 1. The Division of Administrative Hearings has jurisdiction
over the subject matter hereof and the parties hereto. Section
120.57(1), Florida Statutes (1981).
 2. The Administrative Complaint filed herein charges Respondent
with violation of Sections 465.016(1)(e), 465.016(1)(i), and
893.04(1), Florida Statutes. Section 893.04(1), Florida
Statutes, provides that: "A pharmacist, in good faith and in the
course of professional practice only, may dispense controlled
substances upon a written or oral prescription of a practitioner,
under the following conditions ..." and thereafter lists the
requirements for the form of the prescription, the manner in
which the prescription is to be filled, the labeling requirements
for the container in which the medication is dispensed, and
record-keeping requirements for pharmacists filling prescriptions
for controlled substances. In other words, Section 893.04,
Florida Statutes, details the list of conditions under which a
prescription can be lawfully filled. The Administrative Complaint
herein does not allege that Respondent failed to follow any of
the conditions contained in that list, and Petitioner's witnesses
readily admit that Respondent complied with every condition in
that list. Since that statute prescribes the manner in which a
controlled substance can be dispensed, and since Respondent
complied with every item in that list, then there is absolutely
no basis on which Respondent can be found to have violated
Section 893.04(1), Florida Statutes.
 3. Section 465.016(1)(i), Florida Statutes, prohibits a
pharmacist from:
 (i) Compounding, dispensing, or distributing a legend
 drug, including any controlled substance, other than
 in the course of professional practice of pharmacy.
 For purposes of this paragraph, it shall be legally
 presumed that the compounding, dispensing, or
 distributing of legend drugs in excessive or
 inappropriate quantities is not in the best interests
 of the patient and is not in the course of the
 professional practice of pharmacy.
That subsection creates a presumption that the dispensing of a
drug in excessive or inappropriate quantities is not in the best
*1052 interest of the patient and therefore is not in the course of the
professional practice of pharmacy. The Administrative Complaint
fails to charge Respondent with dispensing an excessive or
inappropriate amount of methaqualone to any patient, and
Petitioner's witnesses admit readily that the amount of
methaqualone prescribed on each prescription in question was an
appropriate amount and that no single person obtained through
Respondent an excessive or inappropriate amount of methaqualone.
Accordingly, there is no allegation and no evidence that
Respondent dispensed an excessive or inappropriate quantity which
was not in the best interest of the patient and therefore not in
the course of the professional practice of pharmacy.
 4. Section 465.016(1)(e), Florida Statutes, prohibits a
pharmacist from:
 (e) Violating any of the requirements of this
 chapter; chapter 500, known as the "Florida Food,
 Drug, and Cosmetic Law"; 21 U.S.C., ss. 301-392,
 known as the "Federal Food, Drug, and Cosmetic Act";
 or chapter 893.
Since Petitioner has failed to present evidence that Respondent
violated Chapter 465 or Chapter 893, Florida Statutes, and
since Chapter 500, Florida Statutes, was neither mentioned in
the Administrative Complaint nor in the formal hearing herein,
and since no violation of Chapter 21 of the United States Code
was charged in the Administrative Complaint or identified in the
testimony taken herein, there is no basis on which Respondent can
be found to have violated Section 465.016(1)(e), Florida
Statutes.
 5. Petitioner takes a novel approach in this case in its
interpretation of the statutes charged herein. Although only
medical doctors are permitted to diagnose and prescribe
medication under the laws of the State of Florida, Petitioner
argues that a pharmacist has a moral duty to make a determination
of whether the doctor has prescribed a medication which is "good"
for the patient. Unsurprisingly, Petitioner is unable to cite any
statutory authority for the proposition that a pharmacist (rather
than the Florida Board of Medical Examiners) has jurisdiction to
determine if a prescription written by a doctor is medically
justified or in the best interest of the patient. However, the
Legislature has given doctors the authority to prescribe
medication but has failed to give pharmacists the authority to
"unprescribe" medication. It must be remembered that at all times
material to the charges filed herein, methaqualone was a
legitimate drug which could legally be prescribed and dispensed
anywhere in the State of Florida. The fact that many pharmacies
chose not to sell that medication obviously meant that the few
pharmacies which did sell it would experience a large influx of
persons with legal prescriptions to be filled and further that a
pharmacy filling such prescriptions would sell large quantities
of that product since the product was not available elsewhere.
The fact that people buy a product where it is sold in and of
itself cannot be the basis for disciplining Respondent. Nor can
the refusal of one pharmacist to dispense methaqualone or any
other legal medication be the basis for charging another
pharmacist who chooses to exercise the authority given to him by
his license of filling and dispensing prescriptions.
 Petitioner's whole theory is that because Don's Discount Drugs,
through Respondent, sold a large quantity of a legal substance
Respondent was not dispensing "in good faith" or "in the course
of professional practice only" or "in the best interest of the
patient." However, Section 893.04, Florida Statutes, states
that a pharmacist is in good faith and in the course of
professional practice when he fulfills the list of conditions for
dispensing a controlled substance. Since the Legislature has
stated that that list of conditions shows good faith, Petitioner
cannot change the Legislature's definition of good faith to bad
faith by adding an unwritten condition which in effect states
that it is lawful to do something but not if you do it
frequently. One can only wonder if, under Petitioner's theory,
there is a certain threshold number of sales Respondent could
have made before his good faith turned into bad faith by
*1053 filling one more prescription than that threshold number.
It is difficult to imagine facts more demonstrative of good
faith in the filling of methaqualone prescriptions than are
present in this case. Respondent is not legally required to
verify the DEA number of every doctor writing a prescription for
a controlled substance; Respondent is not legally required to
verify with the prescriber every prescription for a controlled
substance; Respondent is not legally required to obtain driver's
license and photo identification of a person presenting a
prescription for a controlled substance; and Respondent is not
legally required to keep an index card record in order to assure
that no one person is receiving a controlled substance in
excessive or inappropriate amounts by utilizing more than one
physician. One of Petitioner's witnesses essentially testified
that Respondent's/Don's Discount Drugs' dispensing of large
quantities of methaqualone offended his personal ethical
standards. That witness's personal ethical standards are no more
relevant to this case than are those of the undersigned. The only
thing that can be considered is whether Petitioner has proven by
competent substantial evidence that Respondent violated a
specific statutory prohibition. Petitioner has failed to do that.
 RECOMMENDATION
 Based on the foregoing Findings of Fact and Conclusions of Law,
it is
 RECOMMENDED that a Final Order be entered finding Respondent
not guilty of the charges contained in the Administrative
Complaint and dismissing the Administrative Complaint filed
herein against Respondent.
 DONE and RECOMMENDED this 1st day of November, 1983, in
Tallahassee, Leon County, Florida.
 s/Linda M. Rigot
 LINDA M. RIGOT, Hearing Officer
 Division of Administrative Hearings
 The Oakland Building
 2009 Apalachee Parkway
 Tallahassee, Florida 32301
 (904) 488-9675

NOTES
[1] Section 893.03, Florida Statutes (1981), was amended effective July 1, 1982 to delete methaqualone from the list of Schedule II substances and to reclassify it as a Schedule I substance.
[2] As this fact clearly indicates, and as is indeed not disputed, no pharmacist is required to fill any prescription, no matter how regular in form, if he chooses not to do so.
[3] This court has recently affirmed the revocation of the medical license of one of these physicians. Apiau v. The Florida Board of Medical Examiners, 473 So.2d 775 (Fla. 3d DCA 1985).
[4] 893.04(1):

(a) Oral prescriptions must be promptly reduced to writing by the pharmacist.
(b) The written prescription must be dated and signed by the prescribing practitioner on the day when issued.
(c) There shall appear on the face of the prescription or written record thereof for the controlled substance the following information:
1. The full name and address of the person for whom, or the owner of the animal for which, the controlled substance is dispensed.
2. The full name and address of the prescribing practitioner and his federal controlled substance registry number shall be printed thereon.
3. If the prescription is for an animal, the species of animal for which the controlled substance is prescribed.
4. The name of the controlled substance prescribed and the strength, quantity, and directions for use thereof.
5. The number of the prescription, as recorded in the prescription files of the pharmacy in which it is filled.
6. The initials of the pharmacist filling the prescription and the date filled.
(d) The prescription shall be retained on file by the proprietor of the pharmacy in which it is filled for a period of 2 years.
(e) Affixed to the original container in which a controlled substance is delivered upon a prescription or authorized refill thereof, as hereinafter provided, there shall be a label bearing the following information:
1. The name and address of the pharmacy from which such controlled substance was dispensed.
2. The date on which the prescription for such controlled substance was filled.
3. The number of such prescription, as recorded in the prescription files of the pharmacy in which it is filled.
4. The name of the prescribing practitioner.
5. The name of the patient for whom, or of the owner and species of the animal for which, the controlled substance is prescribed.
6. The directions for the use of the controlled substance prescribed in the prescription.
7. A clear, concise warning that it is a crime to transfer the controlled substance to any person other than the patient for whom prescribed.
(f) A prescription for a controlled substance listed in Schedule II may be dispensed only upon a written prescription of a practitioner, except that in an emergency situation, as defined by regulation of the Department of Health and Rehabilitative Services, such controlled substance may be dispensed upon oral prescription. No prescription for a controlled substance listed in Schedule II may be refilled.
(g) No prescription for a controlled substance listed in Schedules III, IV, or V may be filled or refilled more than five times within a period of 6 months after the date on which the prescription was written unless the prescription is renewed by a practitioner.
[5] Specifically, Fisher testified before the hearing officer as follows:

I think there is a judgment factor that has to enter into this.
Number one, that a prescriber is prescribing larger quantities of one particular drug than another; is that prescriber prescribing larger quantities of one drug than other doctors in the area, are the people written these prescriptions of the type that are common to that particular community; are you suddenly getting an onslaught of one particular age group presenting this type of prescription; is he aware of the common knowledge in the community of the abuse of these substances.
* * * * * *
... it all comes under a judgment factor, which would be considered good faith.
[6] These findings were:

3. A drug diversion audit of all Schedule II prescriptions filled at Don's Discount Drugs was initiated by the Petitioner and covered a period from August 4, 1981, through January 6, 1982. The audit revealed that during that time period there were 202,404 methaqualone 300 mg. tablets (Quaaludes) dispensed on 4,695 prescriptions.
4. Respondent dispensed 118,130 of the noted methaqualone tablets on 2,724 prescriptions, or approximately 55 percent of the total methaqualone dispensed.
5. At the time, methaqualone was designated as a Schedule II substance.
[7] We agree that there was in fact no such violation. The only provision even suggested by the DPR in this respect is the portion of section 465.016(1)(i), which states that dispensing drugs "in excessive or inappropriate quantities is not in the best interest of the patient and is not in the course of the professional practice of pharmacy." It is apparent, however, that the clause refers to excessive quantities of drugs supplied to an individual patient, rather than, as in this instance, to an assertedly large amount of a particular drug distributed to multiple patients.
[8] In this regard, the order states:

One of Petitioner's witnesses essentially testified that Respondent's/Don's Discount Drugs' dispensing of large quantities of methaqualone offended his personal ethical standards. That witness's personal ethical standards are no more relevant to this case than are those of the undersigned. The only thing that can be considered is whether Petitioner has proven by competent substantial evidence that Respondent violated a specific statutory prohibition. Petitioner has failed to do that.
[9] Pennsylvania State Board of Pharmacy v. Cohen, 448 Pa. 189, 292 A.2d 277 (1972), so holds. Moreover, as we point out infra, the considerations of fairness upon which the contention relies are the foundation of the heightened standard of proof which is imposed in passing upon a claimed violation of this kind.
[10] In common with each court which has been asked to follow Cohen, see Heller, Megdal, supra, we decline to do so.
[11] In this case, in which the issues are ones of constitutional magnitude and are otherwise so obviously within the competence of courts alone to decide, we consider that the rule which affords respect to an agency's interpretation of the statute it is charged with administering, e.g., Palm Beach Junior College v. United Faculty, 425 So.2d 133, 136 (Fla. 1st DCA 1982), is of little moment. Accordingly, we refer to the fact that the Board's view of the law is the same as ours as no more than a makeweight which may properly be relegated to this footnote.
[12] The concern reflected in these opinions of the ex post facto nature of a subsequent interpretation of a general statute resulting in punishment for previous activity are the same as those that compelled the Pennsylvania court in Cohen, supra, to take the further step of forbidding discipline entirely. See supra, note 9. While, as we have indicated, we do not agree with that extreme position, we wholeheartedly concur that the restrictions upon the process imposed by Bowling and Purvis are entirely appropriate.
[13] We reemphasize the requirements of Purvis and Bowling.
[1] See the hearing examiner's Recommended Order appended to this dissent.
[2] I likewise agree we should not follow Pennsylvania State Bd. of Pharmacy v. Cohen, 448 Pa. 189, 292 A.2d 277 (1972), to the extent that it does not allow for license suspension if a pharmacist's conduct does not fall within certain listed prohibitions (no matter the circumstances) even when he is using independent judgment. See majority opinion at 1044 n. 9.