PER CURIAM.
Lazarus appeals the revocation of his license to practice pharmacy. This case is virtually identical in all respects with Cohn v. Department of Professional Regulation, 477 So.2d 1039 (Fla. 3d DCA 1985), except that in the present case the hearing officer made findings of fact contrary to Lazarus’ position on the question of whether the prescriptions at issue were filled in good faith and in the course of professional practice. See § 465.016(l)(i), Fla.Stat. (1981). As a result, we are squarely faced with deciding whether the evidence was sufficient to support the findings.[1] Concluding that it was, we affirm the revocation of Lazarus’ license.
The evidence revealed that Lazarus worked as a pharmacist at Don’s Discount Drugs (Don’s) between August 1981 and January 1982. During that period Don’s dispensed 202,404 methaqualone pills (quaaludes) of 300 mg. apiece. The evidence also showed that 95% of the schedule II drugs[2] dispensed by Don’s were metha-qualone and over 50% of all the prescriptions filled by Don’s were for methaqual-one. In fact, the pharmacy, anticipating a large number of such prescriptions, prepacked methaqualone prescriptions so that only a typing of the label would be necessary.
Between late October 1981 and January 1982, Don’s filled 3,081 methaqualone prescriptions, 2,241 of which were written by only six doctors. These doctors operated out of “stress clinics” which, the testimony revealed, appeared to function primarily as quaalude prescription mills. It was not uncommon for Don’s to fill fifteen to twenty-five quaalude prescriptions per day which were written by a single doctor. The prescriptions were generally for thirty-five to forty-five pills of 300 mgs. each. A substantial number of the patients were between the ages of twenty and thirty and many had addresses far from Don’s.
*23 The Department of Professional Regulation, Board of Pharmacy (the Department) presented three expert witnesses. The first, Fisher, was a pharmacist and an investigator for the Drug Enforcement Administration. Fisher testified that, based on his experience investigating pharmacies, it was unusual that ninety-five per cent of Don’s schedule II drug prescriptions were for methaqualone. He also stated that it was not common practice to prepack schedule II drugs, as Don’s did with methaqual-one, and that Don’s, in dispensing metha-qualone, appeared to be catering to “the college-age crowd.”
Fisher concluded that, given the volume of quaalude prescriptions and the fact that only a handful of doctors were writing them, the pharmacists who filled them were not acting in good faith or in the course of professional practice.[3]
The Department’s second witness was John Handwerker, Jr., a doctor practicing family medicine for thirty-one years, who had served for three years as an assistant professor of clinical pharmacology [4] at the University of Miami. Handwerker testified that methaqualone is a drug used sparingly as an aid for sleep. In fact, he estimated that he himself had not written more than twelve quaalude prescriptions in his career. He further indicated that it was normally prescribed in 300 mg. tablets for no more than two to three weeks, so that one would expect to see prescriptions for twelve to twenty tablets. In commenting on the fact that Don’s pharmacy often filled, on a single day, many prescriptions for forty-five tablets written by the same doctor, Hand-werker said:
If .there were twenty prescriptions written by one prescriber in one day, each of them for forty-five ... tablets of metha-qualone, that would just be — it is an inconceivable situation.
I can’t conceive of a situation that so many people all walk into one office and all need the same prescription.
Handwerker concluded that a pharmacist who sees such prescriptions should recognize that the prescribing pattern is unusual and should take some action. He testified that the pharmacist could either report the over-prescribing physician or refuse to fill the prescriptions.
The Department’s final witness was Jack Hodus, the owner of Sandy’s Drugs. Ho-dus testified that a pharmacist has discretion in deciding whether to fill a prescription. He stated that the pharmacist should consider a number of factors in making that decision. The factors included who the prescribing doctor was and the doctor’s prescribing pattern, how the customer appeared, whether the customer returned often for similar prescriptions, and how far the customer traveled to get the prescription written or filled. Hodus concluded that filling twenty to twenty-five quaalude prescriptions in one day written by one doctor was excessive and inappropriate and was not acting in good faith or in the course of professional conduct.
Lazarus cross-examined all of the experts and testified in his own behalf. He did establish that he used procedures to ensure that no one particular illegal prescription would be filled. In fact, it is clear on the record that each individual prescription, standing alone, was properly filled. Lazarus presented no evidence, however, to dispute the experts’ testimony that the pattern of prescriptions[5] was very unusual *24 and was evidence sufficient to lead a pharmacist, in the good faith and professional practice of pharmacy, to conclude that many of the prescriptions were calling for the distribution of excessive and inappropriate quantities of quaaludes. Since it is presumed that the dispensing of excessive and inappropriate quantities of a controlled substance is not in the best interest of the patient and is not in the course of the professional practice of pharmacy, § 465.-016(l)(i), Fla.Stat. (1981), the evidence was sufficient to support a revocation of Lazarus’ license. Accordingly, the order revoking his license is
Affirmed.

. On all other issues raised, we are bound by the authority of Cohn v. Department of Professional Regulation.

. A schedule II substance has a high potential for abuse and a currently accepted, but severely restricted, medical use in treatment. Abuse of the substance may lead to severe psychological or physical dependence § 893.03(2), Fla.Stat. (1981). Effective July 1, 1982, § 893.03 was amended and methaqualone was reclassified as a schedule I substance, meaning it has a high potential for abuse and no currently accepted medical use in treatment.

. It is undisputed that Lazarus filled a substantial number of the prescriptions in question.

. Pharmacology is the science of drugs, including their composition, use and effects. The American Heritage Dictionary 982 (W. Morris 1973).

. By pattern of prescriptions, we mean more than the sheer numbers. Large numbers, standing alone, may be meaningless. Here, the expert testimony established that the number of prescriptions was high, that the number of tablets in each prescription was consistently high, and that it was unusual for individual doctors to write so many methaqualone prescriptions for such a high number of pills. In addition, there was evidence that the source of the prescriptions, stress clinics, was of questionable medical legitimacy, that the patients were in a narrow, youthful age range, and that many had addresses far from the pharmacy. While the volume of *24 prescriptions by itself may not be sufficient evidence of bad faith, the other objective facts, when analyzed by experts and compared to customary, professional practice, are sufficient to establish a lack of good faith and unprofessional practice, at least with regard to those prescriptions written by only a handful of doctors.