# DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES v V.H.

## Case No. 86-1061C

State of Florida, Division of Administrative Hearings

July 18, 1986

### APPEARANCES OF COUNSEL

**Carol M. Dittmar,** Assistant Division VI Legal Counsel, Department of Health and Rehabilitative Services, for petitioner.

**Debra M. Metzler, Stiles and Allen, P.A.,** for respondent.

### OPINION

ROBERT T. BENTON, II, Hearing Officer.

### *RECOMMENDED ORDER*

This matter came on for hearing in Lakeland, Florida, before Robert T. Benton, II, Hearing Officer of the Division of Administrative Hearings on June 19, 1986. The parties filed proposed recommended orders on July 7, 1986, and HRS' counsel filed a very thorough memorandum on confidentiality at the same time. The attached appen-

dix addresses the parties' proposed findings of fact by number. The parties are represented by counsel.

By letter dated January 9, 1986, petitioner's District Administrator G. C. Neill advised respondent that the Department of Health and Rehabilitative Services (HRS) refused to amend or expunge "an indicated abuse report involving child care," and invited her to "contest this decision by requesting an administrative hearing pursuant to Florida Statute Ch. 120."

By letter dated February 4, 1986, respondent did request an administrating hearing.

## ISSUE

Whether a child abuse registry record naming respondent should be amended or expunged?

## FINDINGS OF FACT

1. On March 3, 1984, respondent V. H. began working for Tri-County Day Care, mostly at Tri-County's North Lake Day Care Center. Tri-County also operated the George B. Williams Day Care Center about five miles and fifteen minutes away by car. Among V. H.'s duties was driving a van from North Lake to George B. Williams to fetch the children still at George B. Williams when that center closed for the day. She and another child care worker, the "rider" or "van assistant" delivered the children to North Lake, which stayed open later.

2. Ordinarily, V. H. set out in the van for George B. Williams by herself and picked up the rider, C.C., along with the children. C. C. supervised the children while V. H. drove After the children disembarked at North Lake, V. H. drove C. C. home, then returned to North Lake and her other duties, most days.

3. On September 6, 1985, however, S. H. rode with V. H. from North Lake to George B. Williams. At least one child care worker scheduled to help take care of the children at North Lake that day had not shown up for work. S. H., whose normal shift had already ended, suggested that she accompany V. H. so they could drop C. C. off at her home on the way back from George B. Williams: that way the van would have a rider even after C. C. got off, and V. H. would be free to help out at North Lake as soon as she and S. H. arrived with the children, rather than having to run C. C. home then. S. H. first suggested to V. H. that she ride along, and then got permission from Ms. B. who was in charge of North Lake.

274

4. After reaching George B. Williams on Friday, September 6, 1985, V. H. left the van to go inside and ask a questions of Mrs. R., who was in charge of George B. Williams. C. C. was loading children on the van when V. H. returned. V. H. adjusted a seat belt for one of the children. Later, when S. H., who had also left the van, returned, V. H. asked C. C. if they had everybody, and, as soon as a little girl named Heather had had a drink of water, the van set out.

5. Both V. H. and S. H. knew all the children on the van that day. Not all of the children ride every day. There has never been a roll or list of the children on the evenings runs from George B. Williams to North Lake.

6. C. C. got off at her house, as planned. When the van reached North Lake, children left the van row by row. V. H. unfastened the seat belts with which two infants had been restrained in car seats, and handed the children to S. H., V. H. followed with the car seats.

7. Ms. R. had asked V. H., before she set out for George B. Williams, to fumigate the van when she got back. To this end, V. H. obtained a fogger and reentered the van through the still open side doorway. She put it in reverse and backed down a hill, before parking the van, closing the windows, setting off the aerosol bomb, and closing and locking the doors. Through a window she watched from outside as the fumigant dispersed within the van.

8. Later a Mr. N. appeared at North Lake to pick up the H. children, but the two-year-old H. girl could not be found. When asked, V. H., who knew the child but had not seen or heard her all day, suggested they look in the "two-year-old room." Eventually, Ms. B. called Ms. R who asked C. C. where the child was. When word reached North Lake that C. C. had said she had put the child on the van, V. H. grabbed the keys, ran to the van, unlocked it and found the missing child under a seat "coughing and sweating." After a brief hospital stay, the child was discharged.

9. The following Monday, September 9, 1985, Tri-County fired S. H. and V. H., and a report of child abuse or neglect naming S. H. and V. H. as the perpetrators was lodged with the Department of Health and Rehabilitative Services, (HRS). Tri-County furnished V. H. a termination report giving as the reason for separation "child neglect-endangering a child's life." The termination report also commented, "van procedures not followed." Respondent's Exhibit No. 2.

10. Tri-County had written van procedures, which specified with respect to "NIGHT CARE CHILDREN:"

275

1. Check roll as children get on van.

2. Make sure children are safely seated.

3. Make certain all children are off the van.

CHILDREN SHOULD *NEVER* BE ON THE VAN WITHOUT ADULT SUPERVISION. Respondent's Exhibit No. 2.

At no time before September 9, 1985, had V. H. or S. H. seen or been given a copy of these written procedures.

11. On the other hand, one of Tri-County's other employees was given a copy of the written procedures when she was asked to work as a rider or van assistant. At the same time, this employee was told that the rider's job was to keep track of the children and prevent their distracting the driver. This was the general understanding of the van rider's responsibilities.

12. As a result of the complaint to HRS, Suzanne den Breeijen, an intake counselor in HRS' employ, conducted an investigation, beginning on September 10, 1985. That morning, the "child appeared to be alert and out of danger," Petitioner's Exhibit No. 1, and the child's mother "said something about not wanting to press charges against the day care center." *Id.*"

13. The investigation culminated in an institutional abuse investigation summary, which is now on file as part of the child abuse registry, Petitioner's Exhibit No. 1, having been classified as an indicated report, substantiated against V. H. and S. H., whose names appear in an index of child abusers.

14. An indicated report is one that recounts indicators that abuse or neglect has occurred. A substantiated report is one that contains admissions or accounts of medical evidence or eyewitness(es)' reports that prove to the satisfaction of the HRS personnel involved that abuse or neglect has occurred.

15. A report may be substantiated in the sense of containing substantial evidence of abuse or neglect, without being substantiated as against a suspected abuser. In the present case, for example, Ms. Den Breeijen originally felt the report should not be classified as substantiated as against S. H., because she had volunteered after regular working hours and had never been properly trained.

## CONCLUSIONS OF LAW

The parties agree that the issue this case presents is properly framed as whether certain existing child abuse records should be amended or

expunged. The Child Abuse Prevention Training Act of 1985 specifically provides:

> At any time subsequent to the completion of the department's investigation, any subject of an indicated report may request the secretary to amend or expunge the case record and all identifying information in the abuse registry or other computer systems or records pertaining to that report on the grounds that the record is inaccurate or is being maintained in a manner inconsistent with ss. 415.501-415.514. If the secretary refuses or does not act within 30 days of receiving such a request, the subject shall have the right to an administrative hearing to contest whether the record of the report should be amended or expunged. Section 415.504(4)(d), Florida Statutes (1985).

Respondent seeks expunction of the record of the incident of September 6, 1985. Alternatively, she seeks an amendment in the records of the abuse registry to show that the complaint of abuse or neglect is not substantiated as to her. Respondent would like to seek the records, if preserved, amended to reflect additional facts, including the fact that she was never instructed as to any particular van procedures and that the van assistant or rider had primary responsibility for keeping track of children on the van.

## BURDEN OF PROOF ON HRS

Although respondent may be said to be the party seeking a change *in status quo*, the burden of proofs falls on HRS. *Anderson v. Department of Health and Rehabilitative Services*, 482 So. 2d 492 as clarified on reh. 485 So.2d 849 (Fla. 1st DCA 1986). The present proceeding is a "fact-finding endeavor in the nature of a judicial or quasi-judicial proceeding to establish the accuracy of the . . . facts . . . leading to the 'indicated report.' " 485 So.2d at 853. In order to disqualify "an employee . . . from child care service," HRS must meet "the burden of proving the facts showing abuse which are the subject of the indicated report." 485 So. 2d at 854.

The ultimate fact which HRS has the burden of proving in the present case is the allegation that respondent has been guilty of child abuse or neglect, defined for present purposes as "harm or threatened harm to a child's mental or physical health or welfare by the acts or omissions of . . . [a] person responsible for the child's welfare." Section 415.503(3), Florida Statutes (1985).

## TYPE OF BURDEN IMMATERIAL

The precise nature of the burden of proof HRS bears is open to

question. A person as to whom an abuse report is substantiated loses the eligibility to work anywhere in Florida as an operator or an employee of or volunteer in a child care facility. Such a person loses not merely a particular job but the right to pursue his or her occupation in Florida. In this respect, proceedings like these resemble license revocation cases.

License revocation proceedings have been said to be " 'penal' in nature." *State ex rel. Vining v. Florida Real Estate Commission*, 281 So. 2d 487, 491 (Fla. 1973); *Kozerowitz v. Florida Real Estate Commission*, 289 So.2d 391 (Fla. 1974); *Bach v. Florida State Board of Dentistry*, 378 So. 2d 34 (Fla. 1st DCA 1979) (reh. den. 1980). Strict procedural protections apply, and the prosecuting agency's burden is generally believed to be to prove its case clearly and convincingly. See generally *Addington v. Texas*, 441 U.S. 426 (1979); *Ferris v. Austin*, 487 So. 2d 1163, (Fla. 5th DCA 1986); *Anheuser-Busch, Inc. v. Department of Business Regulation, etc.*, 393 So. 2d 1177 (Fla. 1st DCA 1981); *Walker v. State Board of Optometry*, 322 So. 2d 612 (Fla. 3d DCA 1975); *Reid v. Florida Real Estate Commission*, 188 So. 2d 846, 851 (Fla. 2d DCA 1966). A licensee's breach of duty justifies revocation only if the duty as a "substantial basis," *Bowling v. Department of Insurance*, 394 So.2d 165, 173 (Fla. 1st DCA), in the evidence, unless applicable statutes and rules create the duty clearly. *Id.*.

On the other hand, the *Anderson* opinion on rehearing suggests that a child abuse report can be substantiated in certain judicial proceedings, including "custody hearings in divorce cases . . . [and] conceivab[ly] . . . a negligence action . . . for personal injuries resulting from child abuse." 485 So. 2d at 853. In these judicial proceedings, the burdened party must establish its allegations by a preponderance of the evidence only.

Fortunately, this is not a burden of proof case. The facts are clear enough. The real dispute between the parties is legal: When does carelessness by a person responsible for the care of a child amount to neglect within the meaning of Chapter 415, Florida Statutes (1985).

## NEGLIGENCE

In retrospect, it is clear that V. H. was careless. Even if she had come to rely on the regular van assistant, C. C., to monitor her youthful passengers, she knew this Friday was different. Neither V. H. nor S. H. was present when C. C. put each child on the van, and neither counted the children or asked C. C. for a count, although they both knew C. C. would not be present at the disembarkation. But they

278

had no reason to believe a child lay quietly underneath the seat in the van. Until her rescue, neither saw her that afternoon. After dropping C. C. off, V. H. drove straight to North Lake, as far as the evidence shows.

Before fumigating, V. H. would have done well to look under the van seats, if for no other reason than to remove toys, as a witness pointed out. But few would contend that fumigating a car in which a child's toy lies under a seat should earn the fumigator a place on the child abuse registry. V. H.'s lapse was her failure to eliminate the possibility that a child was still on the van, before she left the van unsupervised. When she returned and fumigated, if not before, her oversight threatened "a child's physical or mental health or welfare." Section 415.503, Florida Statutes (1985).

## NOT "NEGLECT"

But simple carelessness of the kind V. H. exhibited here falls short of the neglect Chapter 415 contemplates. The improbability of a silent, hidden passenger bears on the duty of care V. H. owed as driver of the van. Section 415.503(7), Florida Statutes (1985) provides:

"Harm" to a child's health or welfare can occur when the parent or other person responsible for the child's welfare:

(a) Inflicts, or allows to be inflicted, upon the child physical or mental injury, including injury sustained as a result of excessive corporal punishment;

(b) Commits, or allows to be committed, sexual battery, as defined in chapter 794, against the child or commits, or allows to be committed, sexual abuse of a child;

(c) Exploits a child, or allows a child to be exploited, as provided in s. 450.151;

(d) Abandons the child;

(e) Fails to provide the child with supervision or guardianship by specific acts or omissions of a serious nature requiring the intervention of the department or the court; or

(f) Fails to supply the child with adequate food, clothing, shelter, or health care, although financially able to do so or although offered financial or other means to do so; . . . Section 415.503(7) Florida Statutes (1985). V. H. did not intentionally or recklessly inflict injury, or intentionally or recklessly allow injury to be inflicted, or abandon this child, or do anything else that makes her guilty of child abuse or neglect, within the meaning of Chapter 415, Florida

**279**

Statutes (1985). She should not be listed as a substantiated perpetrator in HRS's abuse registry.

*Confidentiality*

The present recommended order has been drafted so as to avoid disclosing the principals' identities. As it happened, nobody not already fully familiar with the facts of the case attended the final hearing, and no transcript has been prepared.

Both parties agree that the records of the Division of Administrative Hearings from which identities of the respondent and the child might be learned should be sealed. Indeed, Section 415.51, Florida Statutes (1985) makes "all records concerning reports of child abuse or neglect" confidential. If read literally, Section 415.51, Florida Statutes (1985) would keep such records even from the hearing officer. But such a restriction would be incompatible with Administrative Procedure Act and the dictates of *Anderson v. Department of Health and Rehabilitative Services*, 482 So.2d 491 as clarified on reh. 485 So.2d 849 (Fla. 1st DCA 1986). Apparently, Section 415.451, Florida Statutes (1985) fails to address formal administrative proceedings.

In keeping with the spirit of the statute, however, and in light of the parties' concurring requests, V. H. should not be penalized by public disclosure of previously confidential records for exercising her statutory right as the "subject of an indicated report . . . [to] request the secretary to amend or expunge the case record. . . ." Section 415.504(d)(d), Florida Statute (1985). Accord, *P. M. vs. Department of Health and Rehabilitative Services*, No. 86-0917C (DOAH; June 24, 1986). See generally *Department of Health and Rehabilitative Services vs. Tallahassee Democrat, Inc.*, 481 So. 2d 958, 960 (Fla. 1st DCA 1986).

It is accordingly,

RECOMMENDED:

1. That the indicated report of neglect on file in HRS' child abuse registry as to the event of September 6, 1985, be amended by being classified unsubstantiated as to V. H., and by attaching the facts found above as an appendix to the report.

2. That respondent's name and all identifying information be expunged from any and all lists, indices or computer records of persons found or believed to be guilty of child abuse or neglect.

3. That the records of the Division of Administrative Hearings in this case, except for the recommended order itself, be sealed.

DONE AND ENTERED this 18th day of July, 1986, at Tallahassee, Florida.